# EXHIBIT A

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/02/2023**
**Clerk of the Court**
BY: LAURA SIMMONS
Deputy Clerk

1  NATHANIEL G. KELLY, SBN 262016
LAW OFFICES OF NATE KELLY
2  201 Spear St. Suite 1100
San Francisco, CA 94105
3  Telephone: (415) 336-3001
Email: Esquire@natekelly.com
4
5  Attorneys for Plaintiff/Complainant,
Peter Johnson
6
7
8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                          COUNTY OF SAN FRANCISCO

**CGC-23-609429**

10
PETER JOHNSON, an individual.**,**          Case No.
11
**VERIFIED COMPLAINT OF PETER**
12           Plaintiff/Complainant,           **JOHNSON**
                                              **1. INVOLUNTARY DISSOLUTION OF A**
13       vs.                                  **   CORPORATION**
                                              **2. BREACH OF FIDUCIARY DUTY**
14  VECTOR HEALTH, INC., a California          **3. DECLARATORY RELIEF PURSUANT**
corporation, and MARC USSINI, an             **   TO CONTRACT**
15  individual,                               **4. DECLARATORY RELIEF PURSUANT**
                                              **   TO BYLAWS**
16       Defendants/Respondent.               **5. DECLARATORY RELIEF PURSUANT**
                                              **   TO CORPORATIONS CODE**
17
18
19                    .
20
21
22
23
24
25
26
27
28

-1-

Peter Johnson alleges:

1.    This Complaint is filed pursuant to Corporations Code section 1800. This Court has jurisdiction of this case under Article VI, section l0 of the California Constitution because it is not a cause given by statute to other trial courts.

2.    Respondent VECTOR HEALTH, INC., (the "Company" or "VHI") is a corporation duly organized and existing under the laws of the State of California, and has its principal office located in the City of San Francisco, San Francisco County, California.  Accordingly, venue is proper in this judicial division.

3.    VHI is not subject to the Banking Law, Public Utilities Act, Savings Association Law, or Insurance Code Sections 1010-1062.

4.    PETER JOHNSON ("Johnson" or "Complainant") is the holders of record of an aggregate of 50% of the shares of VHI.

5.    VHI presently has only two shareholders. The other shareholder is Defendant Marc Ussini ("Defendant" or "Ussini").

**GENERAL ALLEGATIONS**
**(History of VHI)**

6.    VHI was founded in 2008 by Murat (Murry) Alper ("Alper") in California for as an event management company (Speaker Bureau). On or around January 22, 2008, the company adopted its bylaws (the "Bylaws"), attached as Exhibit __A__. VHI provides marketing and promotional opportunities while monitoring state and federal compliance requirements for the pharmaceutical industry to educate the medical community about their specific pharmaceutical products.

7.    On or around January 1, 2010, VHI entered into a Stock Purchase with Johnson, whereby VHI sold and Johnson purchased 1,000,000 shares of the Company's Common Stock (the

"Johnson SPA"). See, Exhibit _B_. Simultaneously, VHI increased the number of directors of the corporation from two to three, electing Johnson to the board of directors.

8.     Prior to joining VHI, Johnson had developed certain intellectual property related to the creation of certain proprietary software.

9.     A Buy/Sell Agreement dated April 14, 2010 was entered into among the Company, Murry Alper, Peter and Marc (the "Buy/Sell Agreement"). See, Exhibit _C_. At this time, the shareholders each possessed 1/3 of the outstanding Common Stock of the Corporation. See, Buy/Sell Agreement Section 1.2.

10.     The Buy/Sell Agreement anticipated that it might be necessary for one or more of the shareholders to take on personal liability in support of VHI but that liability should be relieved as soon as practicable.

11.     When the Company started, before the Complainant had been issued a salary or distributions, Ussini had utilized his American Express credit card ("AmEx") for the purpose of covering pass-through expenses that VHI would pay for on behalf of its clients. Despite client funds being deposited in advance of these costs being undertaken, it was more expedient to pay via credit card. And due to the company having little to no credit history, it was necessary for one of the shareholders to personally guarantee the credit-line. It was agreed, however, that as soon as practicable, the credit line would be transferred into VHI's name.

12.     On or around August 23, 2010, Alper resigned from the Company and his 1,000,000 shares were canceled by VHI following a corporate resolution. See, Exhibit _D_. This action left only two shareholders, Johnson and Ussini, each holding 50% of the outstanding common stock.

13.     Each shareholder was to have separate but equal responsibilities. Ussini, who's previous experience was in the Pharmaceutical industry, was to bring in clients, whereas Complainant was

to be responsible for technology and operations. For example, after launch, Johnson worked for the following year to develop his intellectual property into a SaaS application for VHI, called EventView, after Ussini secured the first Speaker Bureau sale.

14.     The reality, however, was quite different than originally agreed upon and expected. Complainant, who was coming over from the agency side, was able to use his connections to and network, to bring numerous clients in, and was largely responsible for its growth.

15.     At the same time, the EventView application that Complainant developed from his prior IP, was incredibly important to the success and profitability of the business, as customization became a major selling point to new clients. All such customization was overseen by Complainant.

16.     Eventview has a number of stand-alone components such as AssuSign, SpendView, SpeakerView, ContractView, SpeakerCentral, SlideBuilder, Speaker Nomination, Spendview.  While they can be sold separately, they can only function with EventView.

17.     EventView and its components are integrated with Concur, SAP, Veeva, Bill.com and Docusign to create a seamless experience for the end user.  EventView is built on one flat database making it a true "real-time" application.  This is important since the application tracks state and federal government compliance requirements and can proactively alert the end-user to potential compliance violations. No intellectual property assignment was entered into between the Complainant and the Company. This is addressed more fully below.

18.     The application has a very powerful budgeting tool that allows end-users to manage their estimated and actual budgeting on a tiered level from Compliance officers, marketing directors, managers to field staff and includes numerous automated alerts and unique approval process flows.  The system is designed to be highly customizable for the client.

19.    The first client was a small start-up on the East Coast. This client helped VHI fund the creation of its web-based applications. Additional clients followed, including but not limited to some major names in the medical and pharmaceutical industry.

20.    VHI has had a very strong financial history. The company receives both fees and pass-through funds from clients.

21.    VHI accounts, until recently, often had $5 million in the client accounts and hundreds of thousands in the VHI operation account.

22.    On or around 2012, VHI had sufficient capital in order to establish its own credit card and remove the obligation from Ussini, and Complainant offered to do so.

23.    All pass-through money is used to pay for vendor event charges using the corporate Amex cards while Speakers were paid via check.

24.    On average, VHI would perform anywhere between 1,000 and 4,000 events each year at an average fee of $650.00 each, amounting to between $650,000 and $2.6 million in annual earnings.

25.    VHI, as a result of its pass-through fees being paid for using AmEx, has amassed more than one hundred million (100,000,000) AmEx points, which have an exchange value of more than one million dollars ($1,000,000) and an actual cash value of more than six hundred thousand dollars ($600,000).

26.    For more than ten consecutive years following its founding in 2008, VHI has been able to distribute a consistent and significant amount of money to the shareholders.

27.    Ussini, however, was seemingly not happy merely being a successful small business and pushed Complainant to accept venture capital in order to become a venture capital company. Complainant, who has two young children and was more than happy enough taking home nearly

half a million dollars every year, was simply not interested in the risks involved in getting on the venture capital treadmill. And because Complainant was a 50% owner of VHI and the core IP was partially owned by him independently, he was able to shut down this effort.

28.    Then, VHI suffered a brief but very substantial reduction in revenue but has largely been able to recover, and is now growing larger and faster than ever, having steadily increased its visibility and new clients through a new marketing campaign.

29.    Complainant worked to secure two PPP loans totaling $480,000, which were later forgiven.

30.    VHI was also able to apply for and receive ERC from the Government, amounting to more than $250,000. Although VHI received ERC checks at the company address that were collected by Ussini, Ussini did not deposit the checks into VHI's operating accounts.

31.    Complainant also worked to negotiate a licensing deal with Bristol Meyer Squid for a fully customized version of EventView he had developed for them, eventually receiving a $875,000 fee. Complainant oversaw the entire customization project for years prior.

32.    At the same time, in 2020, Ussini embarked on a second division called Vector Health compliance. This was a unilateral decision. This division is centered on the Federal and State compliance reporting clients are required to perform each year. The entire division and its staff are located off-shore as is the divisional manager, a contractor, who does not currently have an agreement with VHI. The division has created its own website, analytics and reporting tools based off of Tableau. The work is highly manual and requires a large staff because of the sheer volume of data.

33.    Based on information and belief, Ussini has allowed the Compliance Division Manager to use VHI funds to hire off-shore developers to create a secondary system that is a copy of some and or all of the current proprietary applications and technology EventView, without the direct

knowledge or any consent of the Complainant.

34.    Ussini has hidden the financial obligations of approximately ($150,000) to the Compliance Division manager by not uploading invoices into VHI AP system (Bill.com) as is customary and not noting and or recording the sum on the financial documents.

35.    Repeated requests from Johnson to Ussini to deposit the ERC checks and disclose financial information about the "compliance division" went unheeded.

36.    Then, Ussini refused to authorize an end of 2021 fiscal year distribution, despite it having been his and Peter's consistent practice to do so. When Complainant sought clarification as to the reasons, Ussini suggested that Complainant sell his 50% of VHI to Ussini.

37.    Throughout 2022, Ussini voted against making profit distributions, which were therefore not permitted as there was not a unanimous vote to do so, even though there was considerably more money in VHI coffers to ensure proper cash flow and a continuance of the marketing initiatives and the company had indeed recognized a profit, requiring Complainant to pay taxes on the profit he did not receive.

38.    Moreover, Ussini declined to pay the taxes the shareholders were responsible for because of the VHI's profits despite being required to do so by VHI's Bylaws.

39.    At the same time, Johnson began to hear whispers about some lavish spending having been done by Ussini, including but not limited to destination trips and vacations and first-class tickets for an international flight.

40.    When Johnson asked Ussini for documentation of the AmEx points, he was rebuffed.

41.    After Ussini repeated his request to buy Complainant's shares in VHI, Complainant stated he was not interested in retiring but that Ussini should make him an offer.

42.    After receiving and rejecting an offer from Ussini to purchase his shares, Complainant

informed him that he believed the fair price for 50% of the Company was over $1.5 million. Ussini, however, said that he would not pay this price because the Buy-Sell Agreement would allow him to pay Complainant much less in the case of voluntary or involuntary termination, due to the recently reduced EBITA.

43.    When, after some negotiation, Complainant insisted that the IP value of the company be included before he would consider any offer from Ussini to buy him out, the relationship between the two owners and directors further deteriorated.

**(Unresolvable Conflicts Between Complainant and Ussini Concerning VHI)**

44.    Following the resignation of Alper and cancellation of his shares on or around August 23, 2010, VHI was left with only two shareholders, Johnson and Ussini, each holding 50% of the outstanding common stock of VHI; and Bylaws, which require a majority vote of the shareholders for almost all corporate decision making. See, Section 2.8 of the Bylaws. Thus, the *de facto* result was a requirement of unanimous consent between Johnson and Ussini for the business to move forward. No procedures were established to allow easy resolutions where conflicts arose.

45.    Since 2021, there have been multiple unresolvable conflicts between Complainant and Ussini over the governance of VHI such that those conflicts have culminated in Ussini hiring a law firm to threaten litigation against Complainant.

46.    Among the unresolvable conflicts directly impacting VHI and the rights of Complainant as shareholder is a disagreement concerning Ussini's attempts to create a new division of the company that is completely separated from Complainant, without providing access to hiring and financial decisions. related thereto. Ussini has even issued "phantom" stock in VHI to the "co-founder" of this new "Compliance" division, without authorization in violation of both the Bylaws and Buy/Sell Agreements.

47.     Based on information and belief, Ussini has diverted company resources, including VHI funds to the Compliance division without the authorization or even knowledge of Complainant.

48.     Furthermore, based on information and belief, Ussini has taken these actions and more in an attempt to push Complainant out of the Company and sell his shares at a substantial discount.

49.     Ussini has withheld from deposit approximately $250,000 in checks made out the VHI, despite repeated requests from Complainant to deposit them.

50.     Ussini has refused to properly transfer earned fees into VHI operating accounts in an attempt to hide profits, and when those profits were nevertheless recorded as such by the company's accountant, Ussini refused authorize distributions for the past seven quarters, even going so far as to refuse to issue tax distributions to pay for the shareholders tax obligations stemming from Company profits, despite this being explicitly required by the Section 16 of the Buy/Sell Agreement.

51.     There has been an additional stalemate regarding the documentation and validation of Complainant and VHI's intellectual property rights in the propriety software

52.     The unresolvable conflicts between the two shareholders reached a new height following Ussini's refusal to reveal company books and records relating to AmEx points earned as a result of using an American Express to pay for pass-through company costs, which seemingly had created a significant corporate asset. Previously, Ussini and Complainant had agreed to use the AmEx points to pay for VHI travel as well as discretionary bonuses for VHI employees, but Marc had recently changed his mind on the matter. Just weeks ago, he announced for the first time that he believed these AmEx points to be his personal property.

53.     Most recently, following months of demands by Complainant to deposit the ERC checks and issue tax payment distributions and Defendant Ussini's refusal to comply or even prove that

he still had the checks, Complainant took steps to hire an outside firm to help ensure VHI funds were not being misappropriated and that Company obligations would be met. When Complainant informed Ussini of his intent, including the desire to protect the Company, Defendant Ussini refused to engage and instead just pointed the finger back at Complainant, hiring an outside firm to threaten Complainant with accusations of misappropriation.

54.    These and other deadlocks likewise prevent other business of VHI to be conducted with advantage to the shareholders.

### (Ussini's Improper Attempts to Control VHI)

55.    The provisions of the Bylaws and By-Sell Agreement restricting the authority of VHI officers and requiring multiple Shareholder approval of certain actions reveal that there was concern at the inception of VHI about a dominant Shareholder taking control of VHI and then using it for the exclusive benefit of that dominant Shareholder.

56.    The Bylaws explicitly require that, "…adequate and correct books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and shares [be kept. And] The books of account shall at all reasonable times be open to inspection by any director."

57.    Since January of 2023 Ussini has refused to provide any insight into the management, operation or financial decisions to the Compliance division, as well as records relating the receipt of ERC checks.

58.    For more than six months, including to this day, Ussini has improperly withheld from deposit more than $250,000 in ERC checks made out to the Company and in his possession. Additionally, at this time, Ussini has been unable to account for at least $13,000 in checks issued to VHI and held by him for almost a year.

59.    Ussini opened a new bank account without approval from the board of directors, in clear violation of the Bylaws, and deposited at least some portion ($80,000 or more) of the ERC money in attempt to usurp additional improper control over VHI.

60.    Moreover, after Complainant refused to authorize the transfer of "Phantom Equity" to the new head of the unauthorized compliance division, Ussini went ahead without proper authorization from the board of directors, in clear violation of VHI's Bylaws and the Buy-Sell Agreement.  See, Exhibit E.

61.    Based on information and belief, Ussini has taken these actions for the improper purpose of pressuring Complainant to sell his interest in VHI.

62.    Ussini has seemingly used company assets to enrich himself, while at the same time hiding company profits, refusing to authorize standard profit distributions, and refusing to authorize tax distributions, all in an attempt to pressure Complainant financially into selling his stake in VHI for less than fair market value.

63.    Complainant, however, has no interest in retiring or otherwise leaving the company he built and has continued to ask Ussini to participate in the proper and joint collaboration required of a company with two equal shareholders.

64.    At this point, there can be no agreement about how to run the business as the conflicts between the two partners have become irreconcilable, thus requiring dissolution.

## FIRST CAUSE OF ACTION
### (Involuntary Dissolution – Cal. Corp. Code § 1800 re: Vector Health, Inc.)

65.    The Complainant hereby realleges and incorporate by reference, as though fully set forth herein, paragraphs 1 through 64 above.

66.    Complainant is informed and believes and based thereon alleges that, based on the facts alleged above, there is internal dissension in VHI and two factions of shareholders in VHI are so

deadlocked that its business can no longer be conducted with advantage to its shareholders. (Cal. Corp. Code § 1800(b)(3).)

67.    Complainant is informed and believes and based thereon alleges that, as evidenced by the facts described above, Ussini, who is currently CEO and CFO of VHI, has knowingly countenanced persistent and pervasive mismanagement, or persistent unfairness to Complainants. (Corp. Code § 1800(b)(4).)

68.    Complainants are informed and believe and based thereon allege that, as evidenced by the facts described above, liquidation is reasonably necessary for the protection of the rights and interests of Johnson. (Corp. Code § 1800(b)(5).)

69.    Importantly, Ussini must be required to pledge and or transfer the clearly corporate assets in his possession to VHI, including but not limited to the AmEx points and ERC funds.

70.    VHI must not be dissolved in such a way that allows Ussini to continue to use the AmEx points earned through corporate expenditures and previously pledged to the company as his personal expense account, to the detriment of VHI and its shareholders.

71.    VHI also must not be dissolved in such a way that a single Shareholder obtains complete control over the VHI's proprietary software or database assets.  Such a result would be grossly inequitable. As alleged previously, VHI's Shareholders fundamentally disagree regarding the rightful ownership of the software created by Johnson prior to joining VHI. In particular, Complainant does not agree with Ussini's unauthorized use, marketing, and/or licensing of the proprietary IP belonging to Complainant. Complainant believes and Ussini disagrees that the shareholders of VHI are contractually bound by the Buy/Sell Agreement with VHI limiting each shareholder's use of the IP.

72.    VHI also must not be dissolved in such a way that a single Shareholder obtains complete

control over the VHI's clients and sales lists.

73.    Additionally, Complainants is informed and believes and based thereon alleges that if Ussini acquired sole control of VHI, he would improperly utilize the disputed IP and corporate AmEx assets to his own financial advantage and to the disadvantage of the Complainant. This distribution structure would be even more detrimental than not dissolving VHI at all.

74.    Thus, in order to protect the rights and interests of each of the Shareholders, VHI must be equitably dissolved in such a way that its primary asset (the proprietary booking software and database and clients) is distributed fairly. That is, no single Shareholder should be able to acquire the VHI software and database and clients in its current form and in such a way that it could maintain the VHI clients currently serviced.

75.    Further, in order to protect the rights and interests of each of the Shareholders, any derivative of the current VHI software and database must be maintained with rights to participate in a data share agreement with the Shareholders. Such a data share agreement would allow the Shareholders to not only maintain VHI's current clients, but would also allow them to continue acquiring new clients.

76.    Additionally, the corporate name "VHI" should not be allowed to be used or acquired by a single Shareholder. The goodwill associated with VHI cannot be equitably distributed if a single Shareholder has the exclusive use and/or control of the VHI name.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty against Defendant Ussini)**

77.    The Complainant hereby realleges and incorporate by reference, as though fully set forth herein, paragraphs 1 through 76 above.

78.    At all times relevant herein, Defendant Ussini had a fiduciary relationship with Complainant Johnson arising out of his positions as officer, director and or controlling

shareholders of VHI and pursuant to which he owed Complainant an obligation and duty to act in the interests of VHI over his own interests or other arbitrary reason.

79.    Defendant Ussini breached his fiduciary duty by causing phantom equity to be issued to the Compliance Division manager on terms Complainant did not agree to, by engaging in the transactions without disclosure to or the consent of the Board or Complainant, by falsifying reports to the Board and Complainant, by failing to follow corporate and contractual protocols for issuance of new security instruments, by blocking the payment of tax distributions to Complainant, by withholding corporate assets from the company, and attempting to pressure Complainant to sell his shares in the Company.

80.    Based on information and belief, Defendant Ussini has also breached his fiduciary duty by using corporate assets for his personal enrichment. He has failed to use the AmEx points earned by the corporation as a result of its business practice as promised and agreed up. Instead of using the points for corporate travel or employee bonuses as agreed, Defendant Ussini has purchased first class flights for himself and his wife, and has refused to transfer the points to the corporation even though the use of his personal credit card stopped being necessary more than ten years prior.

81.    Perhaps most egregiously, Ussini has withheld more than $400,000 in profits from the Company by failing to transfer funds held in client accounts to VHI's operating accounts after they have been earned, waiting over a year in certain cases.

82.    All of these actions, Ussini has taken for the improper purpose of pressuring Complainant to sell his shares to Ussini at a discount.

83.    As a proximate result of Defendant Ussini's conduct as alleged herein, Complainant has been damaged in amount in excess of $585,000, plus such other and further sums as may be proven at trial.

84.    Moreover, in breaching his fiduciary duties, Defendant Ussini acted with oppression, fraud and malice, entitling Plaintiff to an award of additional damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Declaratory Relief Pursuant to Contract)

85.    The Complainant hereby realleges and incorporate by reference, as though fully set forth herein, paragraphs 1 through 84 above.

86.    Pursuant to the Buy/Sell Agreement, Exhibit C, under Section 16, Shareholder Distributions, the shareholders agreed that:

> "…while the Corporation remains taxable as an S-Corporation the Corporation shall make quarterly distributions to the Shareholders. The minimum distribution the Corporation shall make will be equal to the tax imposed on the Shareholders on the bases of the Corporation's earnings for that particular quarter. The occurrence, amount and timing of *any additional shareholder distributions* shall be agreed upon by a majority vote of all the then currently outstanding shares." *Emphasis added*.

87.    Since 2020, however, Defendant Ussini, has objected to and refused to authorize or otherwise pay tax distributions, despite repeated requests by Complainant to do so.

88.    This action is clearly required, and there is no legitimate argument to the contrary or legitimate reason why Ussini has refused to acknowledge or follow through with his corporate obligation.

## FOURTH CAUSE OF ACTION
### (Declaratory Relief Pursuant to Bylaws)

89.    The Complainant hereby realleges and incorporate by reference, as though fully set forth herein, paragraphs 1 through 88 above.

90.    Pursuant to Section 5.10 of the Bylaws, Defendant Ussini as the Chief Financial Officer is required to "… deposit all money and other valuables in the name and to the credit of the

corporation with such depositaries as may be designated by the board of directors." Exhibit ___.

91.    The CFO has only been authorized by the board to make deposits into Citizens Bank.

92.    Ussini, however, for a period of more than six months, has refused to deposit the ERC checks into VHI's company accounts despite repeated requests by Complainant to do so.

93.    If these checks are not deposited shortly, they will become void and VHI will have lost over $250,000 as the result of Ussini's improper actions.

94.    Based on information and belief, Defendant Ussini has attempted or has indeed opened a new account in the name of the company at an unauthorized institution.

95.    This action is clearly not allowed under the Bylaws, and there is no legitimate argument to the contrary or legitimate reason why Ussini has refused to acknowledge or follow through with his corporate obligation.

## FIFTH CAUSE OF ACTION
### (Declaratory Relief Pursuant to Corporations Code)

96.    Complainant hereby realleges and incorporate by reference, as though fully set forth herein, paragraphs 1 through 95 above.

97.    Pursuant to the California Corporations code, directors and officers owe a duty of loyalty to both the companies and shareholders they serve. This duty serves as a strict prohibition against self-dealing.

98.    Whereas, through VHI's business practice of paying significant pass-through expenses on behalf of its clients it is able to earn significant financial rewards from credit card companies, it is therefore improper for the CFO to usurp this financial benefit for himself.

99.    Defendant Ussini is thus improperly withholding a corporate asset for his own personal enrichment in violation of his duty of loyalty to VHI.

100.    This action is clearly not allowed under the law, and there is no legitimate argument to the

contrary or legitimate reason why Ussini has refused to acknowledge or follow through with his legal obligation.

## **PRAYER FOR RELIEF**

WHEREFORE, Complainant prays as follows:

1.  That the court decree a winding up and dissolution of VHI;

2.  That the court entertain such proceedings as may be necessary or proper for the involuntary winding up or dissolution of VHI and, in that regard, make such orders for winding up and dissolution of VHI as justice and equity require;

3.  That Complainant be awarded damages in an amount in amount in excess of $675,000 or such other amount as the court or jury should find Defendant Ussini liable for.

4.  For an Order declaring that the AmEx points are a corporate asset and or that Ussini open a company credit card earning similar benefits for the purpose of earning financial benefit when paying for pass-through expenses on behalf of VHI's clients.

5.  For an Order declaring that VHI must make quarterly distributions at least in the amount equal to the tax imposed on the Shareholders on the bases of VHI's earnings for that particular quarter.

6.  For an Order declaring that Defendant Ussini must deposit the ERC checks into the authorized company bank account.

7.  For an Order declaring that Defendant Ussini may not open a new bank account in the company's name without authorization of Complainant.

8.  For costs of suit herein incurred; and

9.  For such other and further relief as the court may deem proper.

**Respectfully submitted,**

October 2, 2023

**LAW OFFICES OF NATHANIEL KELLY**

By:

Nathaniel G. Kelly
Attorney for Complainant
Peter Johnson

## VERIFICATION

I, Peter Johnson, am the Complainant in this action. I have read the foregoing Complaint and know the contents thereof. The same is true to my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

October 2, 2023

Peter Johnson

-19-

# EXHIBIT A

BYLAWS

OF

VECTOR HEALTH, INC.


ARTICLE I

CORPORATE OFFICES

1.1    PRINCIPAL OFFICE

The board of directors shall fix the location of the principal executive office of the corporation at any place within or outside the State of California.  If the principal executive office is located outside such state and the corporation has one or more busi ness offices in such state, then the board of directors shall fix and designate a principal business office in the State of California.

1.2    OTHER OFFICES

The board of directors may at any time establish branch or subordinate offices at any place or places where the corporation is qualified to do business.

ARTICLE II

MEETINGS OF SHAREHOLDERS

2.1    PLACE OF MEETINGS

Meetings of shareholders shall be held at any place within or outside the State of California designated by the board of direc tors.   In the absence of any such designation, shareholders' meetings shall be held at the principal executive office of the corpo   ration.

2.2   ANNUAL MEETING

The annual meeting of shareholders shall be held each year on a date and at a time designated by the board of directors.  In the absence of such designation, the annual meeting of share   holders shall be held on the second Tuesday of April in each year at 10:00 a.m.  However, if such day falls on a legal holi   day, then the meeting shall be held at the same time and place on the next succeeding full business day.  At the meeting, directors shall be elected, and any other proper business may be transacted.

2.3   SPECIAL MEETING

A special meeting of the shareholders may be called at any time by the board of directors, or by the chairman of the board, or by the president, or by one or more shareholders holding shares in the aggregate entitled to cast not less than ten percent (10%) of the votes at that meeting.

If a special meeting is called by any person or persons other than the board of directors or the president or the chairman of the board, then the request shall be in writing, speci   fying the time of such meeting and the general nature of the busi   ness proposed to be transacted, and shall be delivered personally or sent by registered mail or by telegraphic or other facsimile trans   mission to the chair      man of the board, the president, any vice presi   dent or the secretary of the corporation.  The officer re ceiving the request shall cause notice to be promptly given to the share   holders enti tled to vote, in accordance with the pro   visions of Sec   tions 2.4 and 2.5 of these bylaws, that a meeting will be held at the time requested by the person or persons calling the meeting, so long as that time is not less than thirty-five (35) nor more than sixty (60) days after the receipt of the request.  If the notice is not given within twenty (20) days after receipt of the request, then the person or per   sons request   ing the meeting may give the notice.  Nothing contained in this paragraph of this Section 2.3 shall be construed as limit   ing, fixing or affecting the time when a meeting of shareholders called by action of the board of directors may be held.

2.4     NOTICE OF SHAREHOLDERS' MEETINGS

All notices of meetings of shareholders shall be sent or other        wise given in accordance with Section 2.5 of these bylaws not less than ten (10) (or, if sent by third-class mail pursuant to Section 2.5 of these bylaws, thirty (30)) nor more than sixty (60) days before the date of the meeting.  The notice shall specify the place, date, and hour of the meeting and (i) in the case of a special meeting, the general nature of the business to be trans    acted (no business other than that speci    fied in the notice may be transacted) or (ii) in the case of the annual meeting, those matters which the board of directors, at the time of giving the notice, intends to present for action by the shareholders (but subject to the provisions of the next paragraph of this Section 2.4 any proper matter may be presented at the meeting for such action).  The notice of any meeting at which directors are to be elected shall include the name of any nominee or nominees who, at the time of the notice, the board intends to present for elec    tion.

If action is proposed to be taken at any meeting for approval of (i) a contract or transaction in which a director has a direct or indirect financial interest, pursuant to Section 310 of the Cor    porations Code of California (the "Code"), (ii) an amendment of the articles of incorporation, pursuant to Section 902 of the Code, (iii) a reorganization of the corporation, pursuant to Section 1201 of the Code, (iv) a voluntary dissolution of the corporation, pur    suant to Section 1900 of the Code, or (v) a distribution in dis    solu    tion other than in accordance with the rights of outstanding pre    ferred shares, pursuant to Section 2007 of the Code, then the notice shall also state the general nature of that proposal.

2.5     MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE

Written notice of any meeting of shareholders shall be given either (i) personally or (ii) by first-class mail or (iii) by third-class mail but only if the corporation has outstanding shares held of record by five hundred (500) or more persons (determined as pro    vided in Section 605 of the Code) on the record date for the share    holders' meeting, or (iv) by telegraphic or other written com    munication.   Notices not personally delivered shall be sent charges prepaid and shall be addressed to the shareholder at the address of that share    holder appearing on the books of the corpora    tion or given by the shareholder to the corporation for the purpose of notice.

If no such address appears on the corpora    tion's books or is given, notice shall be deemed to have been given if sent to that share    holder by mail or telegraphic or other written communica    tion to the corporation's principal executive office, or if published at least once in a news    paper of general circulation in the county where that office is located.    Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by tele    gram or other means of written communica    tion.

If any notice addressed to a shareholder at the address of that shareholder appearing on the books of the corporation is returned to the corporation by the United States Postal Service marked to indicate that the United States Postal Service is unable to de    liver the notice to the shareholder at that address, then all future notices or reports shall be deemed to have been duly given without further mailing if the same shall be available to the shareholder on written demand of the shareholder at the principal executive office of the corporation for a period of one (1) year from the date of the giving of the notice.

An affidavit of the mailing or other means of giving any notice of any shareholders' meeting, executed by the secretary, assistant secretary or any transfer agent of the corporation giving the notice, shall be prima facie evidence of the giving of such notice.

2.6    QUORUM

The presence in person or by proxy of the holders of a major    ity of the shares entitled to vote thereat constitutes a quorum for the transaction of business at all meetings of shareholders.    The share    holders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwith    standing the withdrawal of enough shareholders to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum.

2.7    ADJOURNED MEETING; NOTICE

Any shareholders' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the shares represented at that meeting, either in person or by proxy.  In the absence of a quorum, no other busi ness may be transacted at that meeting except as provided in Section 2.6 of these bylaws.

When any meeting of shareholders, either annual or special, is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at the meet ing at which the adjournment is taken. However, if a new record date for the adjourned meeting is fixed or if the adjourn ment is for more than forty-five (45) days from the date set for the origi nal meeting, then notice of the adjourned meeting shall be given.  Notice of any such adjourned meeting shall be given to each share holder of record entitled to vote at the adjourned meeting in accor dance with the provisions of Sections 2.4 and 2.5 of these bylaws.  At any adjourned meeting the corporation may transact any business which might have been transacted at the original meeting.

2.8   VOTING

The shareholders entitled to vote at any meeting of share holders shall be determined in accordance with the provisions of Section 2.11 of these bylaws, subject to the provisions of Sections 702 through 704 of the Code (relating to voting shares held by a fiduciary, in the name of a corporation or in joint ownership).

The shareholders' vote may be by voice vote or by ballot; pro vided, however, that any election for directors must be by ballot if demanded by any shareholder at the meeting and before the voting has begun.

Except as provided in the last paragraph of this Section 2.8, or as may be otherwise provided in the articles of incorporation, each outstanding share, regardless of class, shall be entitled to one vote on each matter submitted to a vote of the shareholders. Any share holder entitled to vote on any matter may vote part of the shares in favor of the proposal and refrain from voting the remain ing shares or, except when the matter is the election of directors, may vote them against the proposal; but, if the shareholder fails to specify the number of shares which the

shareholder is voting affirmatively, it will be conclusively presumed that the share holder's approving vote is with respect to all shares which the shareholder is entitled to vote.

If a quorum is present, the affirmative vote of the majority of the shares represented and voting at a duly held meeting (which shares voting affirmatively also constitute at least a majority of the required quorum) shall be the act of the shareholders, unless the vote of a greater number or a vote by classes is required by the Code or by the articles of incorporation.

At a shareholders' meeting at which directors are to be elec   ted, a shareholder shall not be entitled to cumulate votes (i.e., cast for any candidate a number of votes greater than the number of votes which such shareholder normally is entitled to cast)

2.9    VALIDATION OF MEETINGS; WAIVER OF NOTICE; CONSENT

The transactions of any meeting of shareholders, either annual or special, however called and noticed, and wherever held, shall be as valid as though they had been taken at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each person entitled to vote, who was not present in person or by proxy, signs a written waiver of notice or a consent to the holding of the meet   ing or an approval of the minutes thereof.   The waiver of notice or consent or approval need not specify either the business to be trans   acted or the purpose of any annual or special meeting of share holders, except that if action is taken or proposed to be taken for approval of any of those matters specified in the second paragraph of Sec   tion 2.4 of these bylaws, the waiver of notice or consent or approval shall state the general nature of the proposal. All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Attendance by a person at a meeting shall also constitute a waiver of notice of and presence at that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or con   vened.   Attendance at a meeting is not a waiver of any right to object to the con

sidera    tion of matters required by the Code to be included in the notice of the meeting but not so included, if that objection is expressly made at the meeting.

2.10  <u>SHAREHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING</u>

Any action which may be taken at any annual or special meeting of shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, is signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all shares entitled to vote on that action were present and voted.

In the case of election of directors, such a consent shall be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors. However, a direc    tor may be elected at any time to fill any vacancy on the board of di    rectors, provided that it was not created by removal of a direc    tor and that it has not been filled by the directors, by the writ    ten consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors.

All such consents shall be maintained in the corporate records.  Any shareholder giving a written consent, or the share    holder's proxy holders, or a transferee of the shares, or a per    sonal representative of the shareholder, or their respective proxy holders, may revoke the consent by a writing received by the secre    tary of the corpora    tion before written consents of the number of shares required to authorize the proposed action have been filed with the secretary.

If the consents of all shareholders entitled to vote have not been solicited in writing and if the unanimous written consent of all such shareholders has not been received, then the secretary shall give prompt notice of the corporate action approved by the share    holders without a meeting.   Such notice shall be given to those shareholders entitled to vote who have not consented in writ    ing and shall be given in the manner specified in Section 2.5 of these bylaws.   In the case of approval of (i) a contract or trans    action in which a di    rector has a direct or indirect financial inter    est, pursuant to Section 310 of the Code, (ii) indemnification of a cor    porate "agent," pursuant to Section 317 of the Code, (iii) a reorganization of the corporation, pursuant

7

to Section 1201 of the Code, and (iv) a distribution in dissolution other than in accordance with the rights of outstanding preferred shares, pur suant to Section 2007 of the Code, the notice shall be given at least ten (10) days before the consummation of any action authorized by that approval.

### 2.11   RECORD DATE FOR SHAREHOLDER NOTICE; VOTING; GIVING CONSENTS

For purposes of determining the shareholders entitled to notice of any meeting or to vote thereat or entitled to give con    sent to corporate action without a meeting, the board of directors may fix, in advance, a record date, which shall not be more than sixty (60) days nor less than ten (10) days before the date of any such meeting nor more than sixty (60) days before any such action without a meet    ing, and in such event only shareholders of record on the date so fixed are entitled to notice and to vote or to give consents, as the case may be, notwithstanding any trans    fer of any shares on the books of the corporation after the record date, except as otherwise provided in the Code.

If the board of directors does not so fix a record date:

(a)    the record date for determining shareholders enti    tled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of busi    ness on the business day next preceding the day on which the meeting is held; and

(b)    the record date for determining shareholders enti    tled to give consent to corporate action in writing without a meet    ing, (i) when no prior action by the board has been taken, shall be the day on which the first written consent is given, or (ii) when prior action by the board has been taken, shall be at the close of business on the day on which the board adopts the resolu    tion relat    ing to that action, or the sixtieth (60th) day before the date of such other action, whichever is later.

The record date for any other purpose shall be as provided in Article VIII of these bylaws.

2.12  PROXIES

Every person entitled to vote for directors, or on any other matter, shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the secretary of the corporation.  A proxy shall be deemed signed if the shareholder's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission or otherwise) by the shareholder or the shareholder's attorney-in-fact.  A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) the person who executed the proxy revokes it prior to the time of vot   ing by delivering a writing to the corporation stating that the proxy is revoked or by executing a subsequent proxy and presenting it to the meeting or by voting in person at the meeting, or (ii) written notice of the death or incapacity of the maker of that proxy is received by the corpora   tion before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy.  The dates con   tained on the forms of proxy presump   tively determine the order of execution, regardless of the postmark dates on the envelopes in which they are mailed.  The revocability of a proxy that states on its face that it is irrevocable shall be governed by the pro   visions of Sec   tions 705(e) and 705(f) of the Code.

2.13  INSPECTORS OF ELECTION

Before any meeting of shareholders, the board of directors may appoint an inspector or inspectors of election to act at the meet   ing or its adjournment.  If no inspector of election is so appointed, then the chairman of the meeting may, and on the request of any share   holder or a shareholder's proxy shall, appoint an inspector or in   spectors of election to act at the meeting.  The number of inspec   tors shall be either one (1) or four (4).  If inspectors are appointed at a meeting pursuant to the request of one (1) or more shareholders or proxies, then the holders of a majority of shares or their proxies present at the meeting shall determine whether one (1) or three (3) inspectors are to be appointed.  If any person appointed as inspector fails to appear or fails or refuses to act, then the chairman of the meeting may, and upon the request of any share   holder or a share   holder's proxy shall, appoint a person to fill that vacancy.

9

Such inspectors shall:

(a)     determine the number of shares outstanding and the voting power of each, the number of shares represented at the meet ing, the existence of a quorum, and the authenticity, validity, and effect of proxies;

(b)     receive votes, ballots or consents;

(c)     hear and determine all challenges and questions in any way arising in connection with the right to vote;

(d)     count and tabulate all votes or consents;

(e)     determine when the polls shall close;

(f)     determine the result; and

(g)     do any other acts that may be proper to conduct the election or vote with fairness to all shareholders.

ARTICLE III

DIRECTORS

3.1     POWERS

Subject to the provisions of the Code and any limitations in the articles of incorporation and these bylaws relating to action required to be approved by the shareholders or by the out  standing shares, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direc tion of the board of directors.

3.2     NUMBER OF DIRECTORS

The number of directors of the corporation shall be two.

No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

### 3.3    ELECTION AND TERM OF OFFICE OF DIRECTORS

Directors shall be elected at each annual meeting of share holders to hold office until the earlier of (i) the next annual meeting, (ii) his resignation or (iii) his removal. Each direc tor, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a suc cessor has been elected and qualified.

### 3.4    RESIGNATION AND VACANCIES

Any director may resign effective on giving written notice to the chairman of the board, the president, the secretary or the board of directors, unless the notice specifies a later time for that resignation to become effective. If the resignation of a director is effective at a future time, the board of directors may elect a successor to take office when the resignation becomes effective.

Vacancies in the board of directors may be filled by a major ity of the remaining directors, even if less than a quorum, or by a sole remaining director; however, a vacancy created by the re moval of a director by the vote or written consent of the share holders or by court order may be filled only by the affirmative vote of a major ity of the shares rep resented and voting at a duly held meet ing at which a quorum is present (which shares voting affirmatively also constitute a majority of the required quorum), or by the unani mous written consent of all shares entitled to vote thereon. Each direc tor so elected shall hold office until the next annual meeting of the shareholders and until a successor has been elected and quali fied.

A vacancy or vacancies in the board of directors shall be deemed to exist (i) in the event of the death, resignation or removal of any director, (ii) if the board of directors by resolu tion declares vacant the office of a director who has been declared of unsound mind by an order of court or convicted of a felony, (iii) if the autho rized number of directors is increased, or (iv) if the share holders fail, at any meeting of

11

shareholders at which any director or directors are elected, to elect the number of directors to be elected at that meeting.

The shareholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors, but any such election other than to fill a vacancy created by removal, if by written consent, shall require the consent of the holders of a majority of the outstanding shares entitled to vote thereon.

### 3.5    PLACE OF MEETINGS; MEETINGS BY TELEPHONE

Regular meetings of the board of directors may be held at any place within or outside the State of California that has been desig    nated from time to time by resolution of the board.  In the absence of such a designation, regular meetings shall be held at the prin    cipal executive office of the corporation.  Special meet    ings of the board may be held at any place within or outside the State of Cali    fornia that has been designated in the notice of the meeting or, if not stated in the notice or if there is no notice, at the principal executive office of the corporation.

Any meeting, regular or special, may be held by conference telephone or similar communication equipment, so long as all direc    tors participating in the meeting can hear one another; and all such directors shall be deemed to be present in person at the meeting.

### 3.6    REGULAR MEETINGS

Regular meetings of the board of directors may be held without notice if the times of such meetings are fixed by the board of directors.

### 3.7    SPECIAL MEETINGS; NOTICE

Special meetings of the board of directors for any purpose or purposes may be called at any time by the chairman of the board, the president, any vice president, the secretary or any two directors.

Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail or telegram, charges prepaid, addressed to each director at that director's address as it is shown on the records of the corporation.  If the notice is mailed, it shall be deposited in the United States mail at least four (4) days before the time of the holding of the meeting.  If the notice is delivered personally or by telephone or telegram, it shall be delivered personally or by telephone or to the telegraph company at least forty-eight (48) hours before the time of the holding of the meet   ing.  Any oral notice given personally or by telephone may be communicated either to the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director.  The notice need not specify the purpose or the place of the meeting, if the meeting is to be held at the principal executive office of the corporation.

3.8    QUORUM

A majority of the authorized number of directors shall consti   tute a quorum for the transaction of business, except to adjourn as provided in Section 3.10 of these bylaws.  Every act or decision done or made by a majority of the directors present at a duly held meeting at which a quorum is present shall be regarded as the act of the board of directors, subject to the provisions of Section 310 of the Code (as to approval of contracts or transactions in which a director has a direct or indirect material financial interest), Section 311 of the Code (as to appointment of committees), Sec   tion 317(e) of the Code (as to indemnification of directors), the articles of incorporation, and other applicable law.

A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

3.9    WAIVER OF NOTICE

Notice of a meeting need not be given to any director (i) who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meet   ing, or (ii) who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such direc

13

tors.  All such waivers, consents, and approvals shall be filed with the corpo   rate records or made part of the minutes of the meeting.  A waiver of notice need not specify the purpose of any regular or special meeting of the board of directors.

3.10    <u>ADJOURNMENT</u>

A majority of the directors present, whether or not consti   tuting a quorum, may adjourn any meeting to another time and place.

3.11    <u>NOTICE OF ADJOURNMENT</u>

Notice of the time and place of holding an adjourned meeting need not be given unless the meeting is adjourned for more than twenty-four (24) hours.  If the meeting is adjourned for more than twenty-four (24) hours, then notice of the time and place of the adjourned meeting shall be given before the adjourned meeting takes place, in the manner specified in Section 3.7 of these bylaws, to the directors who were not present at the time of the adjournment.

3.12    <u>BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING</u>

Any action required or permitted to be taken by the board of directors may be taken without a meeting, provided that all members of the board individually or collectively consent in writing to that action.  Such action by written consent shall have the same force and effect as a unanimous vote of the board of directors. Such written consent and any counterparts thereof shall be filed with the minutes of the proceedings of the board.

3.13    <u>FEES AND COMPENSATION OF DIRECTORS</u>

Directors and members of committees may receive such compen   sation, if any, for their services and such reimbursement of expenses as may be fixed or determined by resolution of the board of directors.  This Section 3.13 shall not be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee or otherwise and receiving compensa   tion for those services.

3.14   APPROVAL OF LOANS TO OFFICERS[1]

The corporation may, upon the approval of the board of direc    tors alone, make loans of money or property to, or guarantee the obliga    tions of, any officer of the corporation or its parent or subsidiary, whether or not a director, or adopt an employee benefit plan or plans authorizing such loans or guaranties provided that (i) the board of directors determines that such a loan or guaranty or plan may reasonably be expected to benefit the corporation, (ii) the corpo    ration has outstanding shares held of record by 100 or more persons (determined as provided in Section 605 of the Code) on the date of approval by the board of directors, and (iii) the approval of the board of directors is by a vote sufficient without counting the vote of any interested director or directors.

ARTICLE IV

COMMITTEES

4.1   COMMITTEES OF DIRECTORS

The board of directors may, by resolution adopted by a major    ity of the authorized number of directors, designate one (1) or more committees, each consisting of two or more directors, to serve at the pleasure of the board.  The board may designate one (1) or more directors as alternate members of any committee, who may replace any absent member at any meeting of the committee.  The appointment of members or alternate members of a committee requires the vote of a majority of the authorized number of directors.   Any committee, to the extent provided in the resolution of the board, shall have all the authority of the board, except with respect to:

(a)   the approval of any action which, under the Code, also requires shareholders' approval or approval of the outstanding shares;

---

[1]   This section is effective only if it has been approved by the shareholders in accordance with Sections 315(b) and 152 of the Code.

(b)     the filling of vacancies on the board of directors or in any committee;

(c)     the fixing of compensation of the directors for serving on the board or any committee;

(d)     the amendment or repeal of these bylaws or the adoption of new bylaws;

(e)     the amendment or repeal of any resolution of the board of directors which by its express terms is not so amendable or repealable;

(f)     a distribution to the shareholders of the corpora   tion, except at a rate or in a periodic amount or within a price range determined by the board of directors; or

(g)     the appointment of any other committees of the board of directors or the members of such committees.

4.2    MEETINGS AND ACTION OF COMMITTEES

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of Article III of these bylaws, Section 3.5 (place of meetings), Section 3.6 (regular meetings), Section 3.7 (special meetings and notice), Section 3.8 (quorum), Section 3.9 (waiver of notice), Section 3.10 (adjourn   ment), Section 3.11 (notice of adjournment), and Section 3.12 (action without meeting), with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the board of directors and its members; provided, however, that the time of regular meet   ings of committees may be determined either by resolution of the board of directors or by resolution of the com   mittee, that special meet   ings of committees may also be called by resolution of the board of directors, and that notice of special meetings of committees shall also be given to all alternate mem   bers, who shall have the right to attend all meetings of the com   mittee. The board of directors may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

ARTICLE V

OFFICERS

5.1    OFFICERS

The officers of the corporation shall be a president, a secre   tary, and a chief financial officer.  The corporation may also have, at the discretion of the board of directors, a chairman of the board, one or more vice presidents, one or more assistant sec   re   taries, one or more assistant chief financial officers, and such other officers as may be appointed in accordance with the provisions of Sec   tion 5.3 of these bylaws. Any number of offices may be held by the same person.

5.2    ELECTION OF OFFICERS

The officers of the corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 or Section 5.5 of these bylaws, shall be chosen by the board, subject to the rights, if any, of an officer under any contract of employment.

5.3    SUBORDINATE OFFICERS

The board of directors may appoint, or may empower the presi   dent to appoint, such other officers as the business of the corpo   ration may require, each of whom shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the board of directors may from time to time determine.

5.4    REMOVAL AND RESIGNATION OF OFFICERS

Subject to the rights, if any, of an officer under any con   tract of employment, any officer may be removed, either with or without cause, by the board of directors at any regular or special meeting of the board or, except in case of an officer chosen by

17

the board of directors, by any officer upon whom such power of removal may be conferred by the board of directors.

Any officer may resign at any time by giving written notice to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the accep tance of the resignation shall not be necessary to make it effec tive. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

5.5   VACANCIES IN OFFICES

A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these bylaws for regular appointments to that office.

5.6   CHAIRMAN OF THE BOARD

The chairman of the board, if such an officer be elected, shall, if present, preside at meetings of the board of directors and exer cise and perform such other powers and duties as may from time to time be assigned to him by the board of directors or as may be pre scribed by these bylaws. If there is no president, then the chairman of the board shall also be the chief executive officer of the cor poration and shall have the powers and duties prescribed in Sec tion 5.7 of these bylaws.

5.7   PRESIDENT

Subject to such supervisory powers, if any, as may be given by the board of directors to the chairman of the board, if there be such an officer, the president shall be the chief executive officer of the corporation and shall, subject to the control of the board of directors, have general supervision, direction, and control of the business and the officers of the corporation. He shall preside at all meetings of the shareholders and, in the absence or non existence of a chairman of the board, at all meetings of the board of directors. He shall have the general powers and duties of man age ment usually vested in the office of president of a corporation, and shall have such

other powers and duties as may be pre   scribed by the board of directors or these bylaws.

5.8    VICE PRESIDENTS

In the absence or disability of the president, the vice presi   dents, if any, in order of their rank as fixed by the board of directors or, if not ranked, a vice president designated by the board of directors, shall perform all the duties of the president and when so acting shall have all the powers of, and be subject to all the restrictions upon, the president.   The vice presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the board of directors, these bylaws, the president or the chairman of the board.

5.9    SECRETARY

The secretary shall keep or cause to be kept, at the principal executive office of the corporation or such other place as the board of directors may direct, a book of minutes of all meetings and actions of directors, committees of directors and shareholders.   The minutes shall show the time and place of each meeting, whether regular or special (and, if special, how authorized and the notice given), the names of those present at directors' meetings or com   mittee meetings, the number of shares present or represented at shareholders' meet   ings, and the proceedings thereof.

The secretary shall keep, or cause to be kept, at the princi   pal executive office of the corporation or at the office of the corpora   tion's transfer agent or registrar, as determined by resolu   tion of the board of directors, a share register, or a dupli   cate share register, showing the names of all shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates evidencing such shares, and the number and date of cancellation of every certificate surrendered for cancel   lation.

The secretary shall give, or cause to be given, notice of all meetings of the shareholders and of the board of directors required to be given by law or by these bylaws.  He shall keep the seal of the cor   poration, if one be adopted, in safe custody and shall have such other powers and perform such other duties as may be prescribed by the board of directors or by these bylaws.

5.10    CHIEF FINANCIAL OFFICER

The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the cor   poration, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and shares.  The books of account shall at all reasonable times be open to in   spection by any director.

The chief financial officer shall deposit all money and other valuables in the name and to the credit of the corporation with such depositaries as may be designated by the board of directors. He shall disburse the funds of the corporation as may be ordered by the board of directors, shall render to the president and direc     tors, whenever they request it, an account of all of his trans   actions as chief financial officer and of the financial condi   tion of the corpo   ration, and shall have such other powers and perform such other duties as may be prescribed by the board of directors or these bylaws.

20

ARTICLE VI

INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES,
AND OTHER AGENTS

6.1    INDEMNIFICATION OF DIRECTORS AND OFFICERS

The corporation shall, to the maximum extent and in the manner permitted by the Code, indemnify each of its directors and officers against expenses (as defined in Section 317(a) of the Code), judg  ments, fines, settlements, and other amounts actually and reason  ably incurred in connection with any proceeding (as defined in Sec   tion 317(a) of the Code), arising by reason of the fact that such person is or was an agent of the corporation.  For purposes of this Article VI, a "director" or "officer" of the corporation includes any person (i) who is or was a director or officer of the corpora   tion, (ii) who is or was serving at the request of the corporation as a director or officer of another corporation, part  nership, joint ven  ture, trust or other enterprise, or (iii) who was a director or officer of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation.

6.2    INDEMNIFICATION OF OTHERS

The corporation shall have the power, to the extent and in the manner permitted by the Code, to indemnify each of its employees and agents (other than directors and officers) against expenses (as defined in Section 317(a) of the Code), judgments, fines, settle  ments, and other amounts actually and reason  ably incurred in con  nec  tion with any proceeding (as defined in Section 317(a) of the Code), arising by reason of the fact that such person is or was an agent of the corporation.  For purposes of this Article VI, an "employee" or "agent" of the corporation (other than a director or officer) includes any person (i) who is or was an employee or agent of the corporation, (ii) who is or was serving at the request of the corporation as an employee or agent of another corporation, part   nership, joint venture, trust or other enterprise, or (iii) who was an employee or agent of a corporation which was a predecessor corpo  ration of the corporation or of another enterprise at the request of such predecessor corporation.

21

6.3    PAYMENT OF EXPENSES IN ADVANCE

Expenses incurred in defending any civil or criminal action or proceeding for which indemnification is required pursuant to Section 6.1 or for which indemnification is permitted pursuant to Section 6.2 following authorization thereof by the Board of Direc tors shall be paid by the corporation in advance of the final disposition of such action or proceeding upon receipt of an under taking by or on behalf of the indemnified party to repay such amount if it shall ultimately be determined that the indem nified party is not entitled to be indemnified as authorized in this Article VI.

6.4    INDEMNITY NOT EXCLUSIVE

The indemnification provided by this Article VI shall not be deemed exclusive of any other rights to which those seeking indem nification may be entitled under any bylaw, agreement, vote of shareholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office, to the extent that such additional rights to indemnification are authorized in the Articles of Incorporation.

6.5    INSURANCE INDEMNIFICATION

The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, offi cer, employee or agent of the corporation against any liability asserted against or incurred by such person in such capacity or arising out of such person's status as such, whether or not the corporation would have the power to indemnify him against such liability under the provisions of this Article VI.

6.6    CONFLICTS

No indemnification or advance shall be made under this Article VI, except where such indemnification or advance is mandated by law or the order, judgment or decree of any court of competent jurisdiction, in any circumstance where it appears:

22

(1)    That it would be inconsistent with a provision of the Articles of Incorporation, these bylaws, a resolution of the shareholders or an agreement in effect at the time of the accrual of the alleged cause of the action asserted in the proceeding in which the expenses were incurred or other amounts were paid, which prohibits or otherwise limits indemnification; or

(2)    That it would be inconsistent with any condition expressly imposed by a court in approving a settlement.

ARTICLE VII

RECORDS AND REPORTS

7.1    MAINTENANCE AND INSPECTION OF SHARE REGISTER

The corporation shall keep either at its principal executive office or at the office of its transfer agent or registrar (if either be appointed), as determined by resolution of the board of directors, a record of its shareholders listing the names and addresses of all shareholders and the number and class of shares held by each share   holder.

A shareholder or shareholders of the corporation who holds at least five percent (5%) in the aggregate of the outstanding voting shares of the corporation or who holds at least one percent (1%) of such voting shares and has filed a Schedule 14B with the Securities and Exchange Commission relating to the election of directors, may (i) inspect and copy the records of shareholders' names, addresses, and shareholdings during usual business hours on five (5) days' prior written demand on the corporation, (ii) obtain from the trans      fer agent of the corporation, on written demand and on the tender of such transfer agent's usual charges for such list, a list of the names and addresses of the shareholders who are entitled to vote for the election of directors, and their shareholdings, as of the most recent record date for which that list has been compiled or as of a date specified by the shareholder after the date of demand.  Such list shall be made available to any such shareholder by the transfer agent on or before the later of five (5) days after the demand is received or five (5) days after the date specified in the demand as the date as of which the list is to be compiled.

The record of shareholders shall also be open to inspection on the written demand of any shareholder or holder of a voting trust certificate, at any time during usual business hours, for a purpose reasonably related to the holder's interests as a share holder or as the holder of a voting trust certificate.

Any inspection and copying under this Section 7.1 may be made in person or by an agent or attorney of the shareholder or holder of a voting trust certificate making the demand.

7.2    MAINTENANCE AND INSPECTION OF BYLAWS

The corporation shall keep at its principal executive office or, if its principal executive office is not in the State of Cali for nia, at its principal business office in California the original or a copy of these bylaws as amended to date, which bylaws shall be open to inspection by the shareholders at all reason able times during office hours. If the principal executive office of the cor poration is outside the State of California and the corpo ration has no prin cipal business office in such state, then the secretary shall, upon the written request of any shareholder, furnish to that share holder a copy of these bylaws as amended to date.

7.3    MAINTENANCE AND INSPECTION OF OTHER CORPORATE RECORDS

The accounting books and records and the minutes of proceed ings of the shareholders, of the board of directors, and of any commit tee or committees of the board of directors shall be kept at such place or places as are designated by the board of directors or, in absence of such designation, at the principal executive office of the corpo ration. The minutes shall be kept in written form, and the accounting books and records shall be kept either in written form or in any other form capable of being converted into written form.

The minutes and accounting books and records shall be open to inspection upon the written demand of any shareholder or holder of a voting trust certificate, at any reasonable time during usual business hours, for a purpose reasonably related to the holder's interests as a shareholder or as the holder of a voting trust cer tificate. The

24

inspection may be made in person or by an agent or attorney and shall include the right to copy and make extracts. Such rights of inspection shall extend to the records of each subsidiary corporation of the corporation.

7.4    INSPECTION BY DIRECTORS

Every director shall have the absolute right at any reasonable time to inspect all books, records, and documents of every kind as well as the physical properties of the corporation and each of its subsidiary corporations.  Such inspection by a director may be made in person or by an agent or attorney.  The right of inspec   tion includes the right to copy and make extracts of documents.

7.5    ANNUAL REPORT TO SHAREHOLDERS; WAIVER

The board of directors shall cause an annual report to be sent to the shareholders not later than one hundred twenty (120) days after the close of the fiscal year adopted by the corporation.  Such report shall be sent at least fifteen (15) days (or, if sent by third-class mail, thirty-five (35) days) before the annual meet  ing of shareholders to be held during the next fiscal year and in the manner specified in Section 2.5 of these bylaws for giving notice to shareholders of the corporation.

The annual report shall contain (i) a balance sheet as of the end of the fiscal year, (ii) an income statement, (iii) a statement of changes in financial position for the fiscal year, and (iv) any report of independent accountants or, if there is no such report, the certificate of an authorized officer of the corporation that the statements were prepared without audit from the books and records of the corporation.

The foregoing requirement of an annual report shall be waived so long as the shares of the corporation are held by fewer than one hundred (100) holders of record.

7.6    FINANCIAL STATEMENTS

If no annual report for the fiscal year has been sent to share       holders, then the corporation shall, upon the written request of any shareholder made more than one hundred twenty (120) days after the close of such fiscal year, deliver or mail to the

person making the request, within thirty (30) days thereafter, a copy of a balance sheet as of the end of such fiscal year and an income statement and statement of changes in financial position for such fiscal year.

If a shareholder or shareholders holding at least five percent (5%) of the outstanding shares of any class of stock of the corpo ra tion makes a written request to the corporation for an income state ment of the corporation for the three-month, six-month or nine-month period of the then current fiscal year ended more than thirty (30) days before the date of the request, and for a balance sheet of the corporation as of the end of that period, then the chief financial officer shall cause that statement to be prepared, if not already prepared, and shall deliver personally or mail that state ment or statements to the person making the request within thirty (30) days after the receipt of the request.  If the corpora tion has not sent to the shareholders its annual report for the last fiscal year, the statements referred to in the first paragraph of this Section 7.6 shall likewise be delivered or mailed to the shareholder or shareholders within thirty (30) days after the request.

The quarterly income statements and balance sheets referred to in this section shall be accompanied by the report, if any, of any independent accountants engaged by the corporation or by the cer tifi cate of an authorized officer of the corporation that the financial state ments were prepared without audit from the books and records of the corporation.

7.7    REPRESENTATION OF SHARES OF OTHER CORPORATIONS

The chairman of the board, the president, any vice president, the chief financial officer, the secretary or assistant secretary of this corporation, or any other person authorized by the board of directors or the president or a vice president, is authorized to vote, represent, and exercise on behalf of this corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this corporation.  The authority herein granted may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

26

ARTICLE VIII

## GENERAL MATTERS

8.1    RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND VOTING

For purposes of determining the shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the shareholders entitled to exercise any rights in respect of any other lawful action (other than action by share holders by written consent without a meeting), the board of direc  tors may fix, in advance, a record date, which shall not be more than sixty (60) days before any such action.  In that case, only share   holders of record at the close of business on the date so fixed are entitled to receive the dividend, distribution or allot   ment of rights, or to exercise such rights, as the case may be, notwith   standing any trans   fer of any shares on the books of the corporation after the record date so fixed, except as otherwise provided in the Code.

If the board of directors does not so fix a record date, then the record date for determining shareholders for any such purpose shall be at the close of business on the day on which the board adopts the applicable resolution or the sixtieth (60th) day before the date of that action, whichever is later.

8.2    CHECKS; DRAFTS; EVIDENCES OF INDEBTEDNESS

From time to time, the board of directors shall determine by resolution which person or persons may sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the corporation, and only the persons so authorized shall sign or endorse those instruments.

8.3    CORPORATE CONTRACTS AND INSTRUMENTS:  HOW EXECUTED

The board of directors, except as otherwise provided in these bylaws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the corporation; such authority

27

may be general or confined to specific instances.  Unless so authorized or ratified by the board of directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

### 8.4    CERTIFICATES FOR SHARES

A certificate or certificates for shares of the corporation shall be issued to each shareholder when any of such shares are fully paid.  The board of directors may authorize the issuance of certificates for shares partly paid provided that these cer   tifi   cates shall state the total amount of the consideration to be paid for them and the amount actually paid.  All certificates shall be signed in the name of the corporation by the chairman of the board or the vice chairman of the board or the president or a vice presi   dent and by the chief financial officer or an assistant chief financial officer or the secre   tary or an assistant secretary, certifying the number of shares and the class or series of shares owned by the share   holder.  Any or all of the signatures on the certificate may be facsimile.

In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on a certifi   cate ceases to be that officer, transfer agent or registrar before that certifi   cate is issued, it may be issued by the corpora   tion with the same effect as if that person were an officer, trans   fer agent or registrar at the date of issue.

### 8.5    LOST CERTIFICATES

Except as provided in this Section 8.5, no new certificates for shares shall be issued to replace a previously issued certifi   cate unless the latter is surrendered to the corporation and canceled at the same time.  The board of directors may, in case any share certificate or certificate for any other security is lost, stolen or destroyed, authorize the issuance of replacement certifi   cates on such terms and conditions as the board may require; the board may require indemnification of the corporation secured by a bond or other adequate security sufficient to protect the corpora   tion against any claim that may be made against it, including any expense or liability, on

account of the alleged loss, theft or destruction of the certificate or the issuance of the replacement certificate.

8.6    CONSTRUCTION; DEFINITIONS

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Code shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

ARTICLE IX

AMENDMENTS

9.1    AMENDMENT BY SHAREHOLDERS

New bylaws may be adopted or these bylaws may be amended or repealed by the vote or written consent of holders of a majority of the outstanding shares entitled to vote; provided, however, that if the articles of incorporation of the corporation set forth the number of authorized directors of the corporation, then the autho rized number of directors may be changed only by an amendment of the articles of incorporation.

9.2    <u>AMENDMENT BY DIRECTORS</u>

Subject to the rights of the shareholders as provided in Sec   tion 9.1 of these bylaws, bylaws, other than a bylaw or an amend   ment of a bylaw changing the authorized number of directors (except to fix the authorized number of directors pursuant to a bylaw pro   viding for a variable number of directors), may be adopted, amended or repealed by the board of directors.

CERTIFICATE OF ADOPTION OF BYLAWS

OF

VECTOR HEALTH, INC.

<u>Adoption by Incorporator</u>

The undersigned person appointed in the Articles of Incorpo  ration to act as the Incorporator of Vector Health, Inc. hereby adopts the foregoing bylaws, comprising twenty-three (23) pages, as the Bylaws of the corporation.

Executed this 22nd day of January, 2008

_____

Tomer Tal, Incorporator

# EXHIBIT B

# VECTOR HEALTH, INC

## STOCK PURCHASE AGREEMENT

THIS AGREEMENT is made as of January 1, 2010, between Vector Health, Inc (the "Company") and Peter Johnson ("Purchaser").

WHEREAS, the Company is willing to sell to the Purchaser and the Purchase to desires to purchase shares of Common Stock according to the terms and conditions contained herein.

THEREFORE, the parties agree as follows:

1. Sale of Stock: The Company hereby agrees to sell to the Purchase and Purchaser herby agrees to purchase an aggregate of 1,000,000 shares of the Company's Common Stock (the "Shares"), at the price of $.001

2. Payment of Purchase Price. The purchase price for the Shares shall be paid for by the delivery of serviced rendered to the Company and valued by the board of directors of the Company as $1,000.00.

3. Investment Representations: Restrictions on Transfer.

In connection with the purchase of the Shares, the Purchaser represents to the Company the following:

(i) The Purchaser is aware of the Company's business affairs and financial condition and has acquired eh sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. The Purchaser is purchasing these Shares for eh investment for the Purchaser's own account only and not with a view to, or for the resale in connection with, any "distribution" thereof within he meaning of the Securities Act of 1933, as amended (the "Securities Act").

(ii) The Purchaser acknowledges and understand that the Shares constitute "restricted securities" under the Securities Act and must be held indefinitely unless they are subsequently registered under the Securities Act of an exemption from such registration is available. The Purchaser further acknowledges and understands that the Company is under no obligation to register the Shares. The Purchaser understands that the certificate evidencing he Shares will be imprinted with a legend which prohibits the transfer of the Shares unless they are registered or such registration is not required in the opinion of the counsel satisfaction to the Company.

(iii)   The Purchaser is familiar with the provisions of Rule 144, promulgated the Securities Act, which, in substance, permit limited public resale of securities acquired, directly or indirectly , from the issuer thereof, in a non-public offering subject to the satisfaction of the certain conditions. The Purchase acknowledges that in the even all of the requirement of Rule 144 are not met, compliance with Regulation A or some other registration exemption will be required; and although Rule 144 is not exclusive, the staff of the Commission has expressed its opinion that pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such personals and the brokers who participate in the transaction do so at their own risk.

4. Legends. The share certificate evidencing the Shares issues here under shall be endorsed with the following legends (in addition to any legend required under applicable state securities laws):

THE SHARES REPRESENTED BY THIS CERIFICAE HAVE BEEN AQUIRED FOR INVENSTMENT AND NOT WITH A VEIW TO, OR IN CONNECTION WITH, THE SALE OR DISTRUTION THEREOF. NO SUCH SALE OR DISPOSTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL SASTISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECRUITIES ACT OF 1933.

5. Adjustment for Stock Solit. All references to the number of Shares and the purchase price of the Shares in this Agreement shall be appropriately adjusted to reflect any stock split, stock dividend, or other change in the Shares which may be made by the Company after they dates of this Agreement.

6. General Provisions.

(a)     This Agreement shall be governed y the laws of the State of Califomia. This Agreement represents the entire agreement between the parties with respect to the purchase of Common Stock by the Purchaser and may only be modified or amended in writing signed by both parties.

(b)     Any notice, demand or required or permitted to be given by either the Company or the Purchaser pursuant to the terms of this Agreement shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. Mail, First Class with postage prepaid, and addressed to the parties at the addresses of

the parties set forth at the end of this Agreement or such other address as a party may request by notifying the other in writing.

(c)    The rights and benefits of the Company under this Agreement shall be transferable to tan one or more persons or entities, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by the Company's successors an assigns. The rights and obligations of the Purchaser under this Agreement may only be assigned with the prior written consent of the Company.

(d)    Either party's failure to enforce any provision or provisions of this s Agreement shall not in any way be construed as a waiver of any such provision or provisions, nor prevent that party thereafter from enforcing each an every other provision of this Agreement. The rights granted both parties herein are cumulative and shall not constitute a waiver of either party's right to assert all other legal remedies available to tit under the circumstances.

(e)    The Purchaser agrees upon request to execute any further document or instrument necessary to desirable to carry out the purposes or intent of this Agreement.

(f)    SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF THE CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECIEPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATION US UNLAWFUL UNLESS THE SALE OF THE SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25106 OF THE CALIFORNIA CORPORATE CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

IN WITNESSS WHEREOF, the parties have duly executed this Agreement as of the day and year first set forth above.

VECTOR HEALTH, INC
a California corporation

By: _Marc Ussini_    4/26/2010

Title: Marc Ussini, President

PURCHASER:

_____    4/26/2010
Peter Johnson

155 CONCORD Rd

LEE, NH  03861
(Address)

# EXHIBIT C

## BUY SELL AGREEMENT

THIS BUY SELL AGREEMENT ("Agreement") is made and entered as of this 14 day of April, 2010, by and between Murry Alper, Peter Johnson, and Marc Ussini collectively referred to as the "Shareholders") and Vector Health, Inc., a California corporation (the "Corporation"), with respect to all shares of the Corporation's capital stock now or hereinafter outstanding.

### RECITALS

WHEREAS, the Shareholders desire to protect the Corporation and Shareholders, as well as provide for the continuity of the Corporation's business in the event of the occurrence of certain events discussed in this Agreement.

WHEREAS, the Shareholders agree to perform the duties and obligations incident to being a shareholder in the Corporation upon the terms and conditions hereinafter set forth.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises exchanged, it is hereby agreed as follows:

1.    **THE COMPANY**

1.1    Purpose.  As of the date of this Agreement, the Shareholders agree and understand that the purpose of the Corporation is to engage in any legal business activity and to generate profits which the Corporation will distribute to the Shareholders.

1.2    Capital Structure.  As of the date of this Agreement, the Corporation has 10,000,000 authorized shares of Common Stock.  The Shareholders own the following shares of the issued and outstanding Common Stock of the Corporation:

| Shareholder | No. of Shares | Ownership % |
|---|---|---|
| Murry Alper | 1,000,000 | 33.33% |
| Peter Johnson | 1,000,000 | 33.33% |
| Marc Ussini | 1,000,000 | 33.33% |
| Totals | 3,000,000 | 100% |

1

1.3   Initial Capital Contributions.  The Shareholders agree and understand that each Shareholder made the following initial capital contributions:

| Shareholder | Contribution |
|---|---|
| Murry Alper | Founder's Services |
| Peter Johnson | Founder's Services |
| Marc Ussini | Founder's Services |

1.4   Additional Capital Contributions as Shareholder Loans.  The Shareholders are not required to make any additional capital contributions.  However, if the Corporation requires additional capital at any time, the Shareholders shall give their best efforts to individually contribute such required additional capital on a pro rata basis (relative to then current stock ownership percentages).  If a Shareholder (the "Non-Contributing Shareholder") cannot make his pro rata share of the required additional capital contribution, then the Corporation shall treat the difference between the contributions by the Non-Contributing Shareholder and the contributing Shareholder(s) as shareholder loans (the "Shareholder Loans").  All Shareholder Loans shall be evidenced by a promissory note and shall earn the lowest possible interest rate allowed by law on the principal balance during the term of indebtedness. No Shareholder shall have the right to receive any cash distributions from the Corporation unless and until the Corporation has paid the Shareholder Loans in full.  The parties are free to enter into an agreement that is contrary to the terms set forth in this Section if such agreement is in writing and signed by all parties.

## 2.   SHARE CERTIFICATE LEGEND REQUIREMENTS

On execution of this Agreement, each Shareholder shall have placed on the certificates representing his shares the legend set forth in Section 3 of this Agreement. None of the shares presently owned or subsequently acquired by the Shareholders shall be sold, pledged, encumbered, transferred, or disposed of in any way, whether voluntarily, involuntarily, or by operation of law, except under the terms of this Agreement.  Each Shareholder shall have the right to vote his shares and receive the Shareholder Distributions paid in connection with such shares until the shares are sold or transferred as provided in this Agreement.  The legend stated in Section 3 of this Agreement shall have the same legal effect even if it is not placed on the share certificates in compliance with this Section.

## 3.   LEGEND ON SHARE CERTIFICATES

Each share certificate, whether presently owned or subsequently issued, shall have conspicuously endorsed on its face the following words:

2

"The transfer, sale assignment, hypothecation, encumbrance, or alienation of the Shares represented by this Certificate is restricted by a Buy-Sell Agreement among the Shareholder and Vector Health, Inc. A copy of the Buy-Sell Agreement is available for inspection during business hours at the principal office of the Company. All the terms and provisions of the Buy-Sell Agreement are incorporated by reference and made a part of this certificate."

## 4.  RESTRICTIONS ON VOLUNTARY TRANSFERS & ADDITIONAL ISSUANCES

4.1  Shareholder Sales or Transfers.  No Shareholder shall sell, transfer, pledge, encumber, hypothecate, or in any way dispose of any of his shares or any right or interest in them without obtaining the unanimous prior written consent of the other Shareholders in accordance with this Agreement. Any transfer by any Shareholder in violation of this Agreement shall be null and void and of no effect.

4.2  Corporation Sales or Transfers.  The Corporation shall not issue additional shares without the unanimous prior written consent of all the Shareholders.  Any issuance by the Corporation in violation of this Agreement shall be null and void and of no effect.

## 5.  TRIGGER EVENTS AND PURCHASE PRICE

5.1  Trigger Events.  The Shareholders agree that the occurrence of certain events (the "Trigger Events") will necessitate the sale of shares owned by one Shareholder or his estate to the Remaining Shareholders or the Corporation.  The Trigger Events are listed below and are defined in the paragraphs referred to below:

(1)  Voluntary Withdrawal.No Third Party Offer – Section 6;
(2)  Voluntary Withdrawal Third Party Offer – Section 7;
(3)  Financial Distress of Shareholder – Section 8;
(4)  Death of Shareholder – Section 9;
(5)  Disability of Shareholder – Section 10;
(6)  Divorce of Shareholder – Section 11;
(7)  Termination of Employment – Section 12;

5.2  Definitions.  For purposes of Section 5.3, any Shareholder who is the subject of a Trigger Event shall be considered the "Withdrawing Shareholder" and the non-withdrawing Shareholders shall be considered the "Remaining Shareholders"

5.3  Purchase Price.  Except as stated otherwise in this Agreement (see Death of Shareholder and Divorce of Shareholder), the purchase price (the "Purchase Price") of the Withdrawing Shareholder's Shares (whether purchased by the Remaining Shareholders or the Corporation) shall be determined either by a written agreement

entered into by the parties as of the Withdrawal Date or according to the formula set forth in Section 5.4.

5.4    Fair Market Value.    Fair Market Value of a share of stock of the Corporation at the time of a Trigger Event shall be equal to:

[((last 3 years EBITDA /3) * 4)/ number of shares outstanding],.  For example, if the EBITDA for the previous 3 years was $1,000,000, $2,000,000 and $3,000,000 then the average EBITDA is equal to $2,000,000.  When this is multiplied by the earnings multiple of 4, the Corporation value is $8,000,000.  Based on the current number of shares outstanding (3,000,000), the Purchase Price for each share is equal to $2.67 per share.  If a Withdrawing Shareholder owned 1,000,000 shares (including only those shares that were not subject to a right of repurchase in the Corporation pursuant to that Restricted Stock Purchase Agreement between the Corporation and the Withdrawing Shareholder), the aggregate purchase price would be $2,670,000.00.

If the Corporation does not have 3 years EBITDA, then the earnings portion of the formula will be based on the number of quarters for which the corporation has EBITDA numbers and will be divided by that same number of quarters.

NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE FAIR MARKET VALUE PER SHARE SHALL ONLY APPLY TO THOSE SHARES NOT STILL SUBJECT TO ANY RIGHT OF REPURCHASE PURSUANT TO A RESTRICTED STOCK PURCHASE AGREEMENT BETWEEN ANY SHAREHOLDER AND THE CORPORATION (E.G. ONLY THOSE SHARES WHICH RESPECT TO WHICH THE RIGHT OF REPURCHASE HAS LAPSED).  FOR THOSE SHARES SUBJECT THE RIGHT OF REPURCHASE, THE TERMS OF THAT RESTRICTED STOCK PURCHASE AGREEMENT SHALL CONTROL.

5.5    Intentionally Left Blank.

5.6    Terms of Purchase Price Payments.  The time period and other terms of the Purchase Price payments shall be negotiated by the parties as of the Withdrawal Date.  If the parties cannot agree upon the terms, the terms shall be as follows:

A.    The Corporation or Remaining Shareholders shall make an initial payment equal to 10% of the Purchase Price and, with respect to the balance, shall make equal monthly payments of the Purchase Price over seven (7) years with Six Percent (6%) interest;

B.    If the Purchase Price for the Withdrawing Shareholder's Shares is not paid in full at the time of repurchase, then the Withdrawing Shareholder, its spouse or other designated party may file a UCC-1 financing statement secured by all the assets of the Corporation.

4

05/10/2010  15:55   4155430162          FULCRUM                        PAGE  10/18

Upon receipt of the final payment for such Withdrawing Shareholder's Shares, the UCC-1 will be extinguished.

## 6.    VOLUNTARY WITHDRAWAL – NO THIRD PARTY OFFER

6.1    Voluntary Withdrawal – No Third Party Offer.  If any Shareholder, in his sole discretion, desires to withdraw from his status as a Shareholder of the Corporation and such Shareholder desires to sell his shares to the Remaining Shareholder or the Corporation, he (the "Withdrawing Shareholder") must give written notarized notice to the other Shareholders (the "Remaining Shareholders") of his intent to sell such shares (the "Withdrawing Shareholder's Shares").  The date of such notice shall be referred to as the "Withdrawal Date".

6.2    Right to Purchase -- Remaining Shareholders.  First, the Remaining Shareholders shall have the right to purchase the Withdrawing Shareholders Shares. Within thirty (30) days after receipt of notice from the Withdrawing Shareholder, the Remaining Shareholder shall deliver to the Withdrawing Shareholder either: (1) a written election to purchase; or (2) a written rejection of the offer to purchase.

6.3    Right to Purchase -- Corporation.  If the Remaining Shareholder reject the option to purchase the Withdrawing Shareholder's Shares, the Corporation shall have the option to purchase the Withdrawing Shareholder's Shares for a period of thirty (30) days in accordance with the same procedure set forth in Section 6.2.  If the Corporation does not elect to purchase the Withdrawing Shareholders Shares, the Withdrawing Shareholder shall have the right to sell his shares to a third party in accordance with Section 7 of this Agreement or the parties may mutually agree to submit the matter to arbitration.

6.4    Veto Rights on Offers.  The Remaining Shareholders shall have an aggregate of two (2) veto rights with respect to proposed withdrawal or transfer of shares by a Withdrawing Shareholder under this Section 6 or Section 6 of this Agreement.

## 7.    VOLUNTARY WITHDRAWAL – THIRD PARTY OFFER

7.1    Third Party Offer.  If a Withdrawing Shareholder desires to sell his shares of the Corporation to a third party offeror ("Third Party Offeror"), the Withdrawing Shareholder must provide the Remaining Shareholder with a notarized written original of the offer (the "Offer") made by the Third Party Offeror.

7.2    Right of First Refusal and Purchase Price.  The Remaining Shareholder and the Corporation shall have the right of first refusal to purchase the Withdrawing Shareholders Shares at the purchase price and on the terms stated in the Offer.  The Remaining Shareholders and the Corporation shall have sixty (60) days to exercise

5

such right of first refusal and such exercise must be in writing signed either by the Remaining Shareholder or the Corporation.

7.3    Exercise Period.  During the sixty (60) day period described above, the Withdrawing Shareholder and the Third Party Offeror shall provide the Remaining Shareholders and the Corporation with any and all information necessary to evaluate the Offer.  The Withdrawing Shareholder and the Third Party Offeror shall personally meet with the Remaining Shareholders on at least two (2) occasions during the sixty (60) day period to discuss the Offer and other matters relevant to the Corporation business affairs.

7.4    Co-Sale Rights of Remaining Shareholders.    In the event the Corporation and/or the Remaining Shareholders fail to exercise their right of first refusal and/or reject the right of first refusal, the Remaining Shareholders shall then have co-sale rights ("Co Sale Rights") to sell their shares to the Third Party Offeror on the same terms and condition as the Withdrawing Shareholder.  The Remaining Shareholders shall be eligible to sell the number of shares that are set forth in the following formula:  [(each Remaining Shareholder's shares/ total number of outstanding shares) * total offer value].  By way of example, if the Offer to purchase the shares was for $100,000 and the Withdrawing Shareholder owned 1,000,000 shares while the Remaining Shareholder owned 1,000,000 shares, then each Shareholder would be able to sell the following value of shares: Withdrawing Shareholder $50,000.00, Shareholder 2 – $50,000.00.

7.5    Failure to Exercise Right to Purchase.    Failure by the Remaining Shareholder or the Corporation to exercise the right of first refusal and Co-Sale Rights shall be deemed acceptance and approval by the Remaining Shareholder and the Corporation of the Third Party Offeror as a new Shareholder of the Corporation.  Upon payment by the Third Party Offeror of the purchase price stated in the Offer and execution of this Agreement or an amendment to this Agreement, the Third Party Offeror shall become a Shareholder of the Corporation.

7.6    No Transfer to Nonqualified Stockholder.    Notwithstanding any other provision in this Agreement, in no event may any shares be transferred or sold to a third party which would result in the invalidity of the Corporation's S Corporation status unless the Corporation has previously elected to become taxed as a "C" corporation.

8.    FINANCIAL DISTRESS OF SHAREHOLDER

8.1    Financial Distress.  In the event any Shareholder becomes financially distressed, ("the Financially Distressed Shareholder") by, including but not limited to, adjudicating a bankruptcy (voluntarily or involuntarily), or making an assignment for the benefit of creditors or filing a petition seeking to force the involuntary winding up and dissolution of the Corporation under Corporation Code section 1800, or if substantially all the property of the Shareholder is levied on and sold in a judicial proceeding, the Remaining Shareholder and the Corporation shall have the option for sixty (60) days

following notice of any such events to purchase all of the shares owned by the Financially Distressed Shareholder for a Purchase Price determined in accordance with Section 5.4.

8.2  Right to Repurchase. If the Financially Distressed Shareholder terminates his financial difficulties within two (2) years of the Withdrawal Date, the previously Financially Distressed Shareholder shall have the right to repurchase his previously held shares at the same ownership percentage (if and only if the Corporation has no new Shareholders) and at the same Purchase Price referenced above.  If the Corporation has new Shareholders that were not Shareholders on the Withdrawal Date then the previously Financially Distressed Shareholder and the Corporation shall give their best efforts to reach a mutually agreed upon Purchase Price and ownership percentage. If the previously Financially Distressed Shareholder exercises his option to repurchase the shares within two (2) years of the purchase by the Corporation or the Remaining Shareholder, then the previously Financially Distressed Shareholder will have the right to repurchase the shares at the same price at which the Corporation or Remaining Shareholders purchased the shares.

## 9.  DEATH OF SHAREHOLDER

The Shareholders or the Corporation shall carry single or joint life insurance policies with a face amount of not less than **Five Hundred Thousand Dollars ($500,000)** on each Shareholder naming the Remaining Shareholders or the Corporation as the beneficiary(s). Within the period commencing with the death of any Shareholder (the "Deceased Shareholder") and ending ninety (90) days after the death/qualification of his executor or administrator, the Deceased Shareholders estate shall sell and the Corporation shall purchase all the Deceased Shareholder's shares of the Corporation's stock using the proceeds of any and all life insurance policies covering the Deceased Shareholder at the purchase price and on the terms provided in Section 5 of this Agreement. If the Corporation does not own a life insurance policy on the Deceased Shareholder at the time of his death, then the Remaining Shareholders and then the Corporation shall have the option to purchase all of the shares owned by the Deceased Shareholder in accordance with Section 5 of this Agreement.

## 10.  DISABILITY OF SHAREHOLDER

10.1  Definition of "Disabled". If the Corporation purchases a disability insurance policy ("Disability Policy") on any Shareholder, the terms "disabled" or "disability" shall be defined in accordance with the terms of such policy. In the absence of such a disability insurance policy, a mutually agreed upon, third party medical doctor shall determine the term "disabled". Regardless of the definition of "disabled", a Shareholder may be classified as "disabled" for a physical or mental disability.

10.2  Disabled Shareholder. If the Corporation owns a disability policy on any Shareholder who is rendered disabled (the "Disabled Shareholder") for more than twenty four (24) months, the Corporation shall purchase all of the shares owned by the

Disabled Shareholder using the proceeds from the disability policy at the Purchase Price and on the terms provided in Section 5 of this Agreement. If the disability policy proceeds exceed the Purchase Price to be paid to the Disabled Shareholder, the Corporation shall retain, and the Disabled Shareholder shall have no claim to, such excess. If the Corporation does not own a disability policy on the Disabled Shareholder, then the Remaining Shareholders and then the Corporation shall have the option to purchase all of the shares owned by the Disabled Shareholder in accordance with Section 5 of this Agreement.

10.3   Disagreement.   In the event the Remaining Shareholders and the Disabled Shareholder or his personal representative fail to agree on whether the Disabled Shareholder is totally and permanently disabled for purposes of this Section, the Disabled Shareholder or his personal representative and the Remaining Shareholder shall be bound by the professional medical judgment of a mutually agreed upon third party medical doctor, acting in good faith.

10.4   Death Before Sale.   If the Disabled Shareholder should die after becoming disabled, but before the actual sale of his shares, then the purchase and sale of his shares will be treated as the purchase and sale of a Deceased Shareholders shares under Section 9 of this Agreement.

## 11.   DIVORCE OF SHAREHOLDER

11.1   Divorced Shareholder.   If any Shareholder (the "Divorced Shareholder") enters into a final divorce decree or divorce settlement agreement at any time during the term of this Agreement and the Divorced Shareholders former spouse (the "Divorced Shareholders Spouse") receives an ownership interest in the Divorced Shareholders shares, then the Divorced Shareholders Spouse shall immediately sell and the Corporation shall immediately purchase all the shares owned by the Divorced Shareholders Spouse upon the date of the divorce decree or divorce settlement pursuant to Section 5.3 of this Agreement over a period of seven (7) years at six percent (6%) interest. The Divorced Shareholder shall use his best efforts to retain his shares in any divorce decree or divorce settlement.

11.2   Purchase Price and Payment Terms.   The Purchase Price for the shares owned by the Divorced Shareholders Spouse shall equal the "Fair Market Value" of the shares as determined by a mutually agreed upon third party business valuation expert. The Corporation may effect such a purchase via execution of a Promissory Note payable to the Divorced Shareholders Spouse. The Promissory Note shall be in the amount of the "Fair Market Value" of the shares and shall be payable over seven (7) years with six percent (6%) interest.

11.3   Spousal Consent.   Each Shareholders spouse has executed the Spousal Consent attached hereto as Exhibit A and incorporated by reference herein. Each Shareholder Agrees that in the event it later becomes married or re-married it will immediately have its new spouse execute such consent.

## 12.   TERMINATION OF SERVICE

Notwithstanding any other provision in this Agreement, in the event a Shareholder's services with the Corporation is terminated for "Cause" (as that term is defined in any employment agreement or any Consulting Agreement, as the case may be, between the Corporation and the Shareholder), or if the Shareholder desires to terminate his employment with or consulting services to the Corporation, then the remaining Shareholders and the Corporation shall have the purchase rights set forth in Section 6.1 except that the valuation on which the Corporation and/or the Remaining Shareholders shall purchase the terminated Shareholder's Shares shall be no more than the lesser of book value or the value set forth in Section 5.5 of this Agreement, if the departing shareholder was terminated for Cause.

## 13.   SHAREHOLDER VOTING

Except as otherwise stated in this Agreement, the Shareholders agree and understand that the following actions specifically require approval of a majority of the outstanding shares:

   A.   Admission of new Shareholders;

   B.   Timing and amount of all Shareholder Distributions;

## 14.   UPDATES/AMENDMENTS TO AGREEMENT

The Shareholders hereby agree that they shall meet every year to discuss any updates or amendments to this Agreement. If the Shareholders determine in their sole and absolute discretion that they desire to update or amend this Agreement, all such updates or amendments shall in a writing signed by all Shareholders.

## 15.   OBLIGATIONS OF TRANSFEREES

Unless this Agreement expressly provides otherwise, each transferee or any subsequent transferee of shares in the Corporation, or any interest in such shares, shall hold the shares or interest in the shares subject to all provisions of this Agreement and shall make no further transfers except as provided in this Agreement. Transfer of the shares shall not be entered on the books of the Corporation until the prospective transferee has executed an amended copy of this Agreement. Failure or refusal to sign

9

such an amended copy of this Agreement shall not relieve any transferee from any obligations under this Agreement.

## 16. SHAREHOLDER DISTRIBUTIONS

The parties hereby agree that while the Corporation remains taxable as an S-Corporation the Corporation shall make quarterly distributions to the Shareholders. The minimum distribution the Corporation shall make will be equal to the tax imposed on the Shareholders on the basis of the Corporation's earnings for that particular quarter. The occurrence, amount and timing of any additional shareholder distributions shall be agreed upon by a majority vote of all the then currently outstanding shares.

## 17. OTHER MATTERS

17.1  Stock Certificates.  Upon the occurrence of a Trigger Event or other transfer of shares, the appropriate Purchase Price to be paid for the shares shall be paid as set forth in this Agreement, and the Remaining Shareholders shall cause the certificates representing the purchased shares to be properly endorsed in compliance with this Agreement and shall issue new certificates in the name of the purchaser or purchasers.

17.2  Personal Guarantees.  Prior to or as soon as reasonably practicable after the buyout of the Withdrawing Shareholder, the Corporation shall take all actions necessary to terminate any and all personal guarantees executed by the Withdrawing Shareholder on the Corporation's behalf including any such guarantees of loans, credit lines or other debt in the name of the Corporation.  The Purchase Price paid to the Withdrawing Shareholder shall be reduced by any and all costs related to terminating such personal guarantees.

## 18. TERMINATION OF AGREEMENT

This Agreement shall terminate on:

(a)  The written agreement of all parties; or

(b)  The dissolution, bankruptcy, or insolvency of the Corporation.

## 19. PRESERVING S CORPORATION ELECTION

So long as the Shareholders unanimously agree that the Corporation should remain taxable as an S corporation:

A.  The parties agree to execute any documents and consents necessary, and to cause them to be delivered in a timely manner to the Internal Revenue Service in order to allow the Corporation to

10

elect to be taxed as an S corporation under Internal Revenue Code sections 1361-1379; and

B.  No transfer of the Corporation's shares shall be made by any Shareholder to any corporation, partnership, or trust, or to any other transferee, whether voluntarily, involuntarily, or by operation of law, if the effect of the transfer would be to cause the election to be terminated.

## 20.  SHAREHOLDER WILLS/TRUSTS

Any Shareholder may transfer his/her Shares subject to compliance with applicable laws: (i) in a will to any spouse, parent, sibling, in-law, child or grandchild of the Shareholder, or (ii) to a trust for the benefit of the Shareholder or such spouse, parent, sibling, in-law, child or grandchild of the Shareholder.  However, each Shareholder agrees to include in his/her will or trust a direction and authorization to his/her executor to comply with this Agreement.  However, the failure of any Shareholder to do so shall not affect the validity or enforceability of this Agreement.

## 21.  AGREEMENT TO PERFORM NECESSARY ACTS

Each party to this Agreement agrees to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

## 22.  AMENDMENTS

The provisions of this Agreement may be waived, altered, amended, modified, or repealed, in whole or in part, only on the written consent of all parties to this Agreement.

## 23.  SUCCESSORS AND ASSIGNS

This Agreement shall be binding on and enforceable by and against the parties to it and his respective heirs, legal representatives, successors, and assigns.

## 24.  SEVERABILITY

All provisions of this Agreement are separate and divisible, and if any part is held invalid, the remaining provisions shall continue in full force and effect.

## 25.  NOTICE

All notices, requests, demands, and other communication under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or within forty eight (48)

hours after mailing, if mailed to the party to whom notice is to be given, by first-class mail, registered or certified, postage prepaid, and properly addressed to the party.

## 26.    MEDIATION/ARBITRATION

Except as otherwise provided herein, in the event that the Shareholders cannot agree on a matter involving the Corporation and a deadlock occurs, the Shareholders shall first submit the matter to mediation and then to binding arbitration in Placer County, California in order to break the deadlock.

## 27.    GOVERNING LAW

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

## 28.    ATTORNEYS FEES

In the event any litigation, mediation or arbitration is commenced in connection with this Agreement, the parties hereby agree that the prevailing party (in the event of a judgment or settlement) shall be entitled to payment by the other party of reasonable attorneys' fees expended in connection therewith.

## 29.    ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof and supersedes all prior, written or oral negotiations, representations or agreements. No modification of this Agreement shall be binding on either party unless it is in writing and signed by both parties.

## 30.    COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

12

05/10/2010  15:59   4155430162          FULCRUM                    PAGE  18/18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first shown above.

"CORPORATION"

Vector Health, Inc.
a California corporation

By:
Its:  President

"SHAREHOLDERS"

4/26/10

Murry Alper

4/26/2010

Peter Johnson

4/26/2010

Marc Ussini

13

## ACTION BY UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS OF
## VECTOR HEALTH, INC

In accordance with Section 307(b) of California Corporations Code and Article III, Section 3.12 of the Bylaws of this corporation, the undersigned, constituting all of the directors of this corporation hereby adopt the following resolutions effective as of January 1, 2010:

### 1. Election of Officers

**RESOLVED:** That Peter Johnson is elected as Secretary of this corporation, to serve until his successors is duly elected and qualified:

### 2. Sale of Common Stock

**RESOLVED:** That the officers are hereby authorized to sell and issue 1,000,000 shares of Common Stock to Peter Johnson at a purchase price of $0.001 per share to be paid by the delivery of services rendered in the amount of $1,000.00.

**RESOLVED FURTHER:** That the stock sale to the aforementioned purchaser shall be conducted in such a manner as to comply with all applicable federal and state securities laws.

**RESOLVED FURTHER:** That upon receipt of consideration and execution of a stock purchase agreement, the officers of this corporation are hereby authorized and directed to issues a share certificate to the aforementioned purchaser representing the above described shares.

**RESOLVED FURTHER:** That the officers of the corporation are hereby authorized to take all actions deemed advisable to affect the intent of these resolutions.

### 3. Amendment of Bylaws

**RESOLVED:** That Section 3.2 of the bylaws of this corporation is amended to increase the number of directors from 2 to 3.

This action by written consent was executed effective as of the date first written above.

_____  4/26/10
Murat Alper

_____  4/26/2010
Marc Ussini

05/10/2010  15:59    4155430162          FULCRUM                                    PAGE  01/18

## ACTION BY WRITTEN CONSENT
## OF THE STOCKHOLDERS OF
## VECTOR HEALTH, INC.

Pursuant to Section 603 of the California Corporations Code, the undersigned, constituting the holders of the outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, hereby adopt the following resolutions effective as of January 1, 2010:

### I. Amendment of Bylaws

**RESOLVED:** That Article 3.2 of the Bylaws of this corporation is amended in its entirety to read as follows:

"3.1    NUMBER OF DIRECTORS

The number of directors of the corporation shall be three.

No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires."

**RESOLVED FURTHER:** That Peter Johnson is appointed to the board of directors of this corporation, to fill a vacancy created by the increased board size

This action by written consent was executed effective as of the date first written above.

Murat Alper

Marc Ussini                                    4/26/2010

-1-

# EXHIBIT D

# ACTION BY UNANIMOUS WRITTEN CONSENT

## OF THE BOARD OF DIRECTORS OF

## VECTOR HEALTH, INC.

In accordance with Section 307(b) of California Corporations Code and Article III, Section 3.12 of the Bylaws of this corporation, the undersigned, constituting all of the directors of this corporation, hereby adopt the following resolutions effective as of August 23, 2010:

### I. Cancellation of Shares

**RESOLVED**: That the 1,000,000 shares belonging to Murry Alper, which have been returned to the Company, are hereby cancelled and are of no further effect.

This action by written consent was executed effective as of the date first written above.

_____
Peter Johnson

_____
Marc Ussini

1

## State of California
### Secretary of State

**S**

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**EV76832**

**FILED**

In the office of the Secretary of State
of the State of California

**DEC-26 2013**

1. **CORPORATE NAME**

VECTOR HEALTH, INC.

2. **CALIFORNIA CORPORATE NUMBER**

C3063053

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.
   ☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>237 KEARNY STREET STE 294, SAN FRANCISCO, CA 94108 | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>237 KEARNY STREET STE 294, SAN FRANCISCO, CA 94108 | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/<br>MARC NEAL USSINI | 237 KEARNY STREET STE 294, SAN FRANCISCO, CA 94108 | | | |
| 8. SECRETARY<br>PETER JOHNSON | 237 KEARNY STREET STE 294, SAN FRANCISCO, CA 94108 | | | |
| 9. CHIEF FINANCIAL OFFICER/<br>MARC NEAL USSINI | 237 KEARNY STREET STE 294, SAN FRANCISCO, CA 94108 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME<br>PETER JOHNSON | 237 KEARNY STREET STE 294, SAN FRANCISCO, CA 94108 | | | |
| 11. NAME<br>MARC NEAL USSINI | 237 KEARNY STREET STE 294, SAN FRANCISCO, CA 94108 | | | |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
MARC NEAL USSINI

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 237 KEARNY STREET STE 294, SAN FRANCISCO, CA 94108 | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
CONSULTING & SOFTWARE

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 12/26/2013 | MARC NEAL USSINI | MR | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

SI-200 (REV 01/2013)　　　　　　　　　Page 1 of 1　　　　　　　　　APPROVED BY SECRETARY OF STATE

# EXHIBIT E

# Letter of Intent

## June 22, 2020

This letter of intent summarizes the principal terms of the employment and phantom equity agreement between Vector Health, Inc. (the "Company") and Ned Mumtaz ("Mumtaz"). The completion of the transactions contemplated by this letter will be subject to, among other things, completion of final documents acceptable to Mumtaz and the Company.

### Terms

| | |
|---|---|
| Company Division: | A new compliance division will be established for the Company (the "Compliance Division"). The Compliance Division will be defined as a division of the Company that sells products that service the Company's compliance customers in the bio-pharma space. |
| Employment: | Mumtaz will become a full time employee of the Company pursuant to the terms of an employment offer letter to be entered into between the Company and Mumtaz. |
| Compensation/Benefits: | Mumtaz will be paid a starting salary at the rate of US $110,000 per year, payable monthly on the Company's regular payroll dates. |
| | Mumtaz will be eligible for an annual bonus of up to US $10,000 based on the achievement of personal and Company objectives as specifically outlined in conjunction with the Board of Directors each year. |
| | Mumtaz will be eligible for 3 weeks paid vacation per year, and 10 paid federal holidays per year as defined by Company policy. |
| | Mumtaz will be eligible for health insurance benefits and all other benefits that the Company offers to any similar level employee from time to time. |
| Phantom Equity: | Mumtaz will be granted phantom equity equal to 20% (the "Percentage Interest") of the Compliance Division (the "Phantom Equity"), subject to the buy-in provisions set out below. The Phantom Equity will be subject to the terms and conditions of the Company's phantom equity agreement to be entered into by the Company and Mumtaz. The Phantom Equity will be unvested at the time of grant and will vest in full upon once the Compliance Division has obtained 5 paying customers. |
| | Subject to the buy-in provision below and the terms of the phantom equity agreement to be entered into by the Company and Mumtaz, so long as Mumtaz remains an employee of the Company, Mumtaz will be entitled to share in (i) the profits of the Compliance Division based on his Percentage Interest once the Compliance Division becomes profitable (the "Profit Share") and (ii) the sales proceeds upon a sale of the Compliance Division based on his Percentage Interest once the |

Compliance Division becomes profitable (the "Sales Proceeds Share").

Mumtaz will be required to buy-in to the Phantom Equity in an amount equal to Mumtaz' Percentage Interest of the existing value of the Compliance Division as of January 1, 2020 plus the amount of additional moneys paid into the Compliance Division until the Compliance Division reaches profitability as set forth in the Phantom Equity Agreement.

Mumtaz will be required to buy-in to the Phantom Equity by foregoing 50% of his Profit Share that would otherwise be payable to him until such time as the Phantom Equity has been paid for in full.

If Mumtaz has not bought into his Phantom Equity in full by the time the Compliance Division is sold then Mumtaz will forego an amount of his Sales Proceeds Share equal to the amount that remains owing for this Phantom Equity.

Except as set forth below, this letter is non-binding and is intended solely as a summary of the terms that are currently proposed by the parties. Each party shall be solely liable for all of its own fees, costs and other expenses in conjunction with the negotiation and preparation of this letter and the final agreements pursuant to this letter.

If the terms of this letter are acceptable, please so indicate on the enclosed copy of this letter and return it to the undersigned.

By: _____

Name: Marc Ussini

Date: 7/14/2020 _____

By: _____

Name: Peter Johnson

Date: _____

By: _____

Name: Ned Mumtaz

Date: 7/23/2020 _____

**Letter of Intent**

**June 22, 2020**

This letter of intent summarizes the principal terms of the employment and phantom equity agreement between Vector Health, Inc. (the "Company") and Ned Mumtaz ("Mumtaz"). The completion of the transactions contemplated by this letter will be subject to, among other things, completion of final documents acceptable to Mumtaz and the Company.

**Terms**

| | |
|---|---|
| Company Division: | A new compliance division will be established for the Company (the "Compliance Division"). The Compliance Division will be defined as a division of the Company that sells products that service the Company's compliance customers in the bio-pharma space. |
| Employment: | Mumtaz will become a full time employee of the Company pursuant to the terms of an employment offer letter to be entered into between the Company and Mumtaz. |
| Compensation/Benefits: | Mumtaz will be paid a starting salary at the rate of US $110,000 per year, payable monthly on the Company's regular payroll dates. |
| | Mumtaz will be eligible for an annual bonus of up to US $10,000 based on the achievement of personal and Company objectives as specifically outlined in conjunction with the Board of Directors each year. |
| | Mumtaz will be eligible for 3 weeks paid vacation per year, and 10 paid federal holidays per year as defined by Company policy. |
| | Mumtaz will be eligible for health insurance benefits and all other benefits that the Company offers to any similar level employee from time to time. |
| Phantom Equity: | Mumtaz will be granted phantom equity equal to 20% (the "Percentage Interest") of the Compliance Division (the "Phantom Equity"), subject to the buy-in provisions set out below. The Phantom Equity will be subject to the terms and conditions of the Company's phantom equity agreement to be entered into by the Company and Mumtaz. The Phantom Equity will be unvested at the time of grant and will vest in full upon once the Compliance Division has obtained 5 paying customers. |
| | Subject to the buy-in provision below and the terms of the phantom equity agreement to be entered into by the Company and Mumtaz, so long as Mumtaz remains an employee of the Company, Mumtaz will be entitled to share in (i) the profits of the Compliance Division based on his Percentage Interest once the Compliance Division becomes profitable (the "Profit Share") and (ii) the sales proceeds upon a sale of the Compliance Division based on his Percentage Interest once the |

Compliance Division becomes profitable (the "Sales Proceeds Share").

Mumtaz will be required to buy-in to the Phantom Equity in an amount equal to Mumtaz' Percentage Interest of the existing value of the Compliance Division as of January 1, 2020 plus the amount of additional moneys paid into the Compliance Division until the Compliance Division reaches profitability as set forth in the Phantom Equity Agreement.

Mumtaz will be required to buy-in to the Phantom Equity by foregoing 50% of his Profit Share that would otherwise be payable to him until such time as the Phantom Equity has been paid for in full.

If Mumtaz has not bought into his Phantom Equity in full by the time the Compliance Division is sold then Mumtaz will forego an amount of his Sales Proceeds Share equal to the amount that remains owing for this Phantom Equity.

Except as set forth below, this letter is non-binding and is intended solely as a summary of the terms that are currently proposed by the parties. Each party shall be solely liable for all of its own fees, costs and other expenses in conjunction with the negotiation and preparation of this letter and the final agreements pursuant to this letter.

If the terms of this letter are acceptable, please so indicate on the enclosed copy of this letter and return it to the undersigned.

By: _____
Name: Marc Ussini

Date: 7/14/2020 _____

By: _____
Name: Peter Johnson

Date: _____

By: _____
Name: Ned Mumtaz

Date: 7/23/2020 _____

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

VECTOR HEALTH, INC., a California corporation, and MARC USSINI, an individual

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Peter Johnson, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Civic Center Courthouse<br><br>400 McAllister Street, San Francisco, CA 94102 | CASE NUMBER:<br>*(Número del Caso):*<br>CGC-23-609429   **CGC-23-609429** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
NATHANIEL G. KELLY, 201 SPEAR STREET, SUITE 1100, SAN FRANCISCO, CA 94105; (415) 336-3001

| DATE:<br>*(Fecha)* **10/03/2023** | Clerk, by<br>*(Secretario)* _____ **JEFFREY FLORES** | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.

2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[ Print this form ]   [ Save this form ]   [ Clear this form ]

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| NATHANIEL G KELLY, SBN 262016<br>201 SPEAR STREET, SUITE 1100, SAN FRANCISCO, CA 94105<br>TELEPHONE NO.: 415-336-3001   FAX NO. (Optional):<br>E-MAIL ADDRESS: ESQUIRE@NATEKELLY.COM<br>ATTORNEY FOR (Name): PETER JOHNSON, PLAINTIFF | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**10/03/2023**<br>**Clerk of the Court**<br>BY: JEFFREY FLORES<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: CIvic Center Courthouse

CASE NAME:
PETER JOHNSON VS. VECTOR HEALTH INC., A CALIFORNIA CORPORATION ET AL

| CIVIL CASE COVER SHEET<br>[x] Unlimited   [ ] Limited<br>(Amount demanded exceeds $25,000)   (Amount demanded is $25,000 or less) | Complex Case Designation<br>[ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>CGC-23-609429 |
|---|---|---|
| | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [x] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is   [x] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action (specify): 5
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 10/02/2023

Nathaniel G Kelly
(TYPE OR PRINT NAME)                    *Nate Kelly*
                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2



### Superior Court of California, County of San Francisco
### Alternative Dispute Resolution
### Information Package



> The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to trial.

**WHY CHOOSE ADR?**

It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

**\*\*Electing to participate in an ADR process does not stop the time period to respond to a complaint or cross-complaint\*\***

**WHAT ARE THE ADR OPTIONS?**

The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

**1) MANDATORY SETTLEMENT CONFERENCES**

Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

**2)  MEDIATION**

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

   **(A)  MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF),** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending. Experienced professional mediators work with parties to arrive at a mutually agreeable solution. The mediators provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience  requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. BASF staff handles conflict checks and full case management. The success rate for the program is 67% and the satisfaction rate is 99%. BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

   **(B)  JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco  Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional  malpractice, insurance coverage,  toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program.  A preference for a specific judge may be indicated.  The court will coordinate assignment of cases for the program.  There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

   **(C)  PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

   **(D)  COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

## 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

### (A) JUDICIAL ARBITRATION

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

### (B) PRIVATE ARBITRATION

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
415-551-3869
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*)

FOR COURT USE ONLY

TELEPHONE NO.:

ATTORNEY FOR (*Name*):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: _____ |
| | **DEPARTMENT 610** |

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session. Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available to those who qualify. communityboards.org

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days   ☐ 90-120 days   ☐ Other (please specify) _____

☐ **Other ADR process** (describe) _____

2) **The parties agree that the ADR Process shall be completed by (date):** _____

3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Dated: _____

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Dated: _____

☐ *Additional signature(s) attached*

ADR-2  10/18      **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**